# UNITED STATES BANKRUPTCY COURT
# FOR THE
# DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**JONATHAN COWLES,**                              Chapter 7
    Debtor                              Case No. 15-10235-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MAINE COAST SHELLFISH, LLC,**
    Plaintiff
v.                                          Adv. P. No. 15-1069
**JONATHAN COWLES,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the First Amended Complaint to Determine Nondischargeability of Debt filed by Maine Coast Shellfish, LLC ("Maine Coast" or the "Plaintiff") against Jonathan Cowles ("Cowles," the "Defendant," or the "Debtor"). Pursuant to its three-count Amended Complaint, the Plaintiff seeks to except a debt, arising from an alleged "fraudulent scheme carried out by the Debtor . . . to convert property of and divert funds from the Plaintiff," from discharge under 11 U.S.C. § 523(a)(2)(A) (Count I), (a)(2)(B) (Count II), and (a)(4) (Count III). The Defendant filed an Answer, denying most material allegations set forth in the Amended Complaint.

1

The Court conducted a three-day trial on August 1, 2017, August 2, 2017, and August 14, 2017 at which five witnesses testified and 30 exhibits were admitted into evidence. The principal of Maine Coast, Thomas Edward Adams ("Adams"), and the Debtor testified at length. Three employees of Maine Coast also testified, supporting Adams's testimony. The critical issue presented is whether the Plaintiff sustained its burden of proving an exception to discharge under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), or (a)(4), the determination of which turns, in part, on whether the Debtor was a credible witness.

The Court makes the following findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

### A. Adams's Testimony

Adams, the founder and CEO of Maine Coast, testified about his 32-year involvement in the seafood industry which began when he was 15 years old and working in York, Maine as a laborer for a small lobster company. In his mid-twenties, after completing college, he became a 50% owner of that enterprise, "taking over daily operation of running the entire business." In May of 2009, Adams sold his 50% ownership stake in the business, agreeing to "a two-year non-compete to buy, distribute, [and] sell live lobster anywhere in the world."

At the expiration of the non-competition agreement, Adams founded Maine Coast, initially engaging four or five employees, including an administrator, an executive with seafood experience charged with buying and selling seafood products, and warehouse

laborers and drivers.   Adams testified that, in 2012, Maine Coast hired its first salesperson, Matthew Gallucci ("Gallucci"), to sell live lobsters.  Gallucci is still employed by Maine Coast and testified about the terms of his employment.  Adams explained that prior to employing Gallucci, he handled sales of live lobsters, including "a little bit of Asian shipping."  He indicated that the company had not yet developed inroads into the Asian market but he recognized that it was a "quickly developing market."

Adams testified that he was introduced to Cowles in the fall of 2013 by David DiCenso ("DiCenso"), the owner of Boston Wholesale Lobster, a friendly competitor of Maine Coast.  According to Adams, DiCenso told him that Cowles "was looking for a full-time employment position with a lobster or seafood company and that David was not hiring one but had recommended Jonathan Cowles speak to us because we were a fast-growing new company and could potentially be looking for help in sales."  Adams further testified that Cowles, who had been employed by East Coast Seafood ("East Coast"), one of the largest shippers of lobsters in North America and a competitor of Maine Coast, informed him that he had lived in China and South Korea, as well as Hawaii, although he was originally from Maine.  In addition, Adams testified that Cowles informed him that he spoke several languages, including Mandarin and Portuguese.  Indeed, he had been trained as an interpreter of Mandarin by the U.S. Government.  He also had obtained a Masters in Business Administration.  Because the "Asian appetite for North American lobster was growing quickly," Adams indicated that he was very interested in interviewing Cowles.

On September 12, 2013, Cowles emailed Adams a document, captioned "General Background for Jonathan Cowles." In that document, Cowles set forth his education, which included a Masters of Business Administration from Chaminade University in Honolulu, Hawaii, proficiencies in multiple languages, and recent professional work, including work as an "Exporter/businessman in Asia." Notably, Cowles did not specifically identify the entity for which he served as "Asia Region Director" or include references in his General Background. Cowles testified that he forwarded references to Adams separately.

At around the time Adams received Cowles's "General Background," Adams reached out to the owner of East Coast, Michael Tourkistas ("Tourkistas"), a competitor whom Adams highly regarded as a leader in the shellfish industry. Cowles had a non-competition agreement with East Coast and, in addition, Adams had another concern:

> Jonathan had explained to me that there had been some discrepancy in a financial transaction between East Coast and a customer that Jonathan had East Coast ship lobsters to. I wanted to hear -- I'd heard Jonathan's side of things but I wanted to hear from East Coast, their version of events as well.

Adams testified about what Cowles had told him:

> He told me that due to quality issues with a very important customer of East Coast that he was selling to, the customer was threatening to never buy from East Coast Seafoods again. Jonathan did not want to lose the customer so that he had created some sort of entity to ship East Coast lobster under a false entity, had the customer pay him directly and then he paid East Coast those monies.

Adams testified that Tourkistas had "a similar recollection." Adams explained:

> He [Tourkistas] did not know all the particulars of what happened but he did say that something happened, they shipped lobsters to somebody. The lobsters he didn't -- I don't believe he knew exactly where they went but he

4

did tell me he had been paid in full by Jonathan Cowles for the lobster but that the money from China had been directed to Jonathan Cowles before being presented to East Coast Seafood.

Adams indicated that Tourkistas did not express concerns about Cowles, had considered rehiring him, and recognized his potential to be a very successful salesperson within the lobster industry, especially for sales to Asia.  Thus, Adams made the decision to hire Cowles as an employee.

Adams testified about the distinctions in the seafood industry between employees and independent contractors, as well as the role of brokers.  With respect to brokers he testified as follows:

> Most often my idea of the role of a broker . . . [is that] . . . they  . . . initiate the sales process with the customer. They also initiate the buying side to us. We ship to their customer usually on -- we supply the credit terms for the customer and the broker gets just a flat commission in the middle.

Adams stated that Maine Coast had relationships with two brokers who would initiate purchases from Maine Coast on behalf of their customers.  Maine Coast would ship to the brokers' customers based on credit established by the customers and collect receivables directly from the customers.  Once paid by a customer, Maine Coast would then pay a commission to the broker of 10 to 20 cents per pound of lobsters sold.  Adams testified that in discussions with Cowles he only contemplated an employee relationship, with one exception, discussed below.

On November 12, 2013, Adams, on behalf of Maine Coast, as "an employer at will," extended an offer of employment to Cowles.  Cowles accepted the offer set forth in the letter (the "Letter Agreement") the same day.  In the Letter Agreement, Adams indicated

that Cowles would have the title of "Export Sales Manager," would report directly to

him, and would receive a "starting base salary" of $1,000 per week, plus a ".05/lb

commission for all direct sales that you develop when related invoices have been paid in

full." Adams further stated: "[t]hese commissions will go towards the [$]21,789.56 paid

to American Holdco Inc.[1] on your behalf for the release of your employment agreement

until paid in full." In the Letter Agreement, Adams also referred to eligibility for health

insurance and paid vacation, as well as the requirement that Cowles "review and sign

the company's standard non-disclosure and non-compete agreement." Adams testified

that the benefits referenced in the Letter Agreement would not have been offered to

independent contractors or brokers. Adams, however, admitted Cowles did not sign a

non-compete agreement with Maine Coast. Cowles enthusiastically accepted the offer

contained in the Letter Agreement, signing his name to it on November 12, 2013, adding

"Thank you, Tom!"

According to Adams, Cowles "did some commission sales" for Maine Coast prior

to his acceptance of employment. Adams explained that Cowles "called and said, 'I have

these customers looking for lobsters; can we sell to them and can -- will you pay me a

commission on them' and I agreed to do so." In this regard, Cowles testified that he also

did consulting work and prepared a report for Maine Coast in which he "weigh[ed] the

---

[1] American Holdco, Inc. was the holding company for East Coast Seafood. Tourkistas was its CEO in November of 2013.

6

risks of the China market, the opportunities and risks where I heavily emphasized the need to have credit insurance on all shipments that went out to Asia."

In conjunction with Cowles's employment, American Holdco, Inc., Maine Coast, and Cowles executed an agreement pursuant to which Maine Coast agreed to pay American Holdco, Inc. $21,789.56, with an initial payment of $5,447.39, followed by monthly payments of $907.89 for 12 months and a final payment of $5,447.39 on December 1, 2014, to obtain Cowles's release from his "Employment agreement and promissory note obligations *during his employment with Maine Coast, exclusively & solely for the activities performed on behalf of Maine Coast*"(emphasis supplied).[2]   Indeed, in the agreement, Maine Coast promised to make the payments so long as Cowles remained "an employee of Maine Coast."  Maine Coast's payments to American Holdco, Inc. were in lieu of sales commissions to Cowles.  Adams testified that he believed Maine Coast was protected by Cowles's non-competition agreement with East Coast.

Adams further testified that while Cowles was working for Maine Coast he was required to exclusively sell lobsters on behalf of Maine Coast, "with the exception of one particular relationship he had with Boston Wholesale Lobster." That relationship involved brokered sales for one customer to whom Boston Wholesale Lobster shipped

---

[2] The Agreement provided:

> If payments are not received from Maine Coast within the specified time frame than [sic] the release of the employment contract and promissory notes are immediately withdrawn and Jonathan Cowles is no longer released from AHI in regards to the terms, conditions and obligations of the employment agreement and debts owed.  In the event should Jonathan Cowles employment terminate for any reason all payments received by AHI from Maine Coast are non-refundable.

large lobsters and as to which it paid Cowles a commission.  The exception was the subject

of a verbal agreement among Adams, Cowles and DiCenso.  The brokered sales took

place within a niche market, namely sales of jumbo lobsters to South Korea.

Upon commencing work at Maine Coast, Cowles executed a Form W-4ME, a

Maine Employee's Withholding Allowance Certificate, as well as a federal Form W-4.  He

executed the form by affixing his signature under "Employee's Pay Signature." With

respect to the number of allowances and exemptions, Cowles signed the document under

penalty of perjury.  Upon commencement of employment, Maine Coast assigned him

existing accounts involving Tony Chen and Tongfa Seafood.

Adams described the office configuration at Maine Coast, indicating that the sales

personnel occupied an area where conversations about trades could be easily overheard.

Adams testified that Cowles often utilized his language skills in calls to customers.

Adams also testified that Cowles initially kept regular business hours, but Maine Coast

provided him with "a little bit more flexibl[ity] than most . . . other employees," owing to

his family responsibilities as a single parent, and time differences between Maine,

Hawaii, and Asia where he was developing business.

Adams also testified that he established a price range - "a generic price often with

negotiation room" - for lobster sales on a daily basis or "at least a couple times a week"

as the market tended to change quickly.  In addition, he testified that lobster could be

sold at a higher margin than what he set forth on price sheets, under certain

circumstances and in certain places, adding "Asia being one them usually, not always."

When that happened, he expected that the benefit of the increased margin would inure

to Maine Coast.  Adams denied ever telling Cowles or Gallucci that all he cared about was getting the minimum prices set forth on the price sheets and that as long as they sold lobsters for the amount set forth on the price sheet they could keep the extra profit for themselves.

At the time Cowles was employed at Maine Coast, sales were generated by phone calls, emails, text messages, and "other methods of communication applications such as WhatsApp and some others that were used in Asia."  Sale orders were handwritten on invoice sheets with multiple copies for distribution to the customer, the office manager for filing in the company's QuickBooks system, and for operations.  The practice changed with respect to Asian orders when Cowles began working at Maine Coast.  According to Adams, "Cowles would in most cases have Jen Ewing [the office manager] provide him copies of the invoices and he would have the shipping documents necessary from the freight forwarders that we were using for each particular shipment and he would then forward it to the bulk of his customer base."  Adams testified that Maine Coast acceded to Cowles's practice because he had far more experience with what was required in Asian countries and because Maine Coast trusted him.

Adams also testified about various entities that were customers of Maine Coast both before and after Cowles accepted employment with the company.  SK Seafood, LLC ("SK Seafood") and its affiliate, Shanghai Light, were customers prior to Cowles's employment, and Maine Coast had a relationship with Stephen Chen ("Chen"), a purchasing agent for Shanghai Light.  According to Adams, Maine Coast was shipping to Shanghai Light on behalf of SK Seafood and paying commissions both before and after

9

Cowles's employment.   Adams indicated that Chen set up deals and Maine Coast shipped to Chen's customers.   In early 2014, SK Seafood and/or Shanghai Light, however, failed to pay invoices that added up to approximately $200,000.00, and Maine Coast ceased shipping to it or its customers in March of 2014.   Adams testified that the loss caused a "tough time" for the company.[3]

Maine Coast also sold lobsters to Apollo Corporation ("Apollo"), a seafood broker for customers in the Pacific and Asia beginning approximately one month after Cowles's employment.   Maine Coast shipped seafood to Aloha Best Seafood, Inc. ("Aloha Best") using Apollo's services beginning on December 13, 2013 and continuing through March 29, 2014.   With the exception of three shipments to Korea, Maine Coast invoiced Apollo $271,955.25 for lobsters shipped to Aloha Best, using Apollo's services.   Cowles caused Apollo to be engaged as a broker because he had a longstanding relationship with Jae Kwon Lee ("Lee"), its principal, and considered himself a partner with Lee, although he had no ownership interest in Apollo.   Cowles earned commissions from Maine Coast on its sales of lobsters to Apollo.   In addition, he obtained commissions from Apollo. According to Adams, Cowles never disclosed his relationship with Lee or his receipt of commissions from Apollo.   Adams indicated he would have questioned Cowles's relationship with Apollo if had been aware of it.   Nevertheless, Cowles insisted that the

---

[3] Plaintiff's Exhibit 26 contains a summary of sales to Shanghai Light beginning on August 29, 2013 and ending on March 25, 2014.  Sales during that time period involved 67,654.60 pounds of lobster and totaled $599,722.66.

principal of Apollo asked him to manage his brokerage and did so to help him close the gap between his income and expenses.

Maine Coast began shipping lobster directly to and billing Aloha Best,[4] which owned a restaurant and function hall in Honolulu, Hawaii, beginning in early 2014, around the time that Maine Coast ceased making shipments to Shanghai Light.[5] According to Adams,

> At some point in the winter and early spring of 2014 Mr. Cowles advised us at Maine Coast that Aloha Best was going to begin utilizing some of his contacts in Asia to sell lobsters and that we would still be billing these lobsters to Aloha Best but we would be shipping not only still to Aloha's Best's location in Hawaii but we would be shipping to Asia . . . on behalf of Aloha Best as well.

In this regard, Cowles instructed Aloha Best to wire payments to his personal bank account ending in ***921 at TD Bank in Rowley, Massachusetts. Adams explained that he had no reason to question the new arrangement, which occurred around the time Maine Coast ceased shipping lobsters to either Shanghai Light or SK Seafood in March 2014, although he was unaware of wire transfers directly to Cowles's bank account. He added that the owner of Aloha Best was Chinese and the use of Cowles's Chinese contacts to develop sales in Asia raised no "red flags" as Aloha Best "had proven to be a reliable customer."

Invoices prepared by Maine Coast establish that, between March 27, 2014 and April 30, 2014, Maine Coast shipped to, and billed Aloha Best for, lobsters and that Aloha

---

[4] Aloha Best remains a customer of Maine Coast.

[5] Plaintiff's Exhibit 23 reflects invoices to Aloha Best beginning on March 27, 2014.

Best paid the invoices in full within 14 days (although the terms were "Net 7").  In mid-May of 2014, Maine Coast also began shipping to other entities, including Shanghai GQT Industrial Co., LTD, located in Shanghai, China, "Shenzhen Shun Xingsheng, Agricultural Products Co., Ltd." located in Shenzhen China, and "Shanghai Regal," although it continued to bill Aloha Best.[6]  In mid-May, Aloha Best was no longer paying invoices in full.  For example, two invoices (#10291 and #10292) that totaled $70,063.20 were paid by a check in the sum of $47,500, leaving an outstanding balance of $22,573.20.  Indeed, for shipments made between May 14, 2014 and June 5, 2014, Maine Coast ceased receiving full payment for Aloha Best for invoices #10292, #10295, #10296, #10318, #10320, #10327, #10343, #10344, #10356, #10382, #10383, #10384, #10386, #10396, #10411, and #10463, which invoices totaled $489,899.60.[7]  As will be discussed in more detail below, Cowles, in a memorandum to Adams dated June 4, 2014, asked Adams for time to enable Aloha Best "to tighten up its payment schedules."

Certain of the outstanding invoices to Aloha Best issued between May 15, 2014 and June 5, 2014 were eventually paid according to Adams.  Cowles provided Maine Coast with six TD Bank "Official Checks," bearing dates between May 23, 2014 and June

---

[6] Adams explained that the shipments were to import companies owing to Chinese licensing and custom regulations.  The actual customers in China and elsewhere in Asia retrieved the lobsters from the import companies.

[7] These invoices are included in Plaintiff's Exhibit 5, which contains a duplicate of invoice #10396.  Invoice #10396 is also included in Plaintiff's Exhibit 7, which contains a compilation of invoices, which, according to Adams remain unpaid.  Accordingly, the amount of invoice #10396, i.e., $34,469.60, must be subtracted from the sum of $524,369.20, which was the total of partially paid or unpaid Aloha Best invoices in Exhibit 5.

9, 2014, totaling $484,553.00, a sum $5,346.60 less than the Aloha Best invoices totaling $489,899.60. All checks, which are included in Plaintiff's Exhibit 6, contained a notation of Dong Nan Xi Bei, a reference to Dong Nan Xi Bei Co. ("Dong Nan"). All of the checks, except two, also had some reference to "Aloha;" only one, dated May 28, 2014, referenced an invoice number, i.e., invoice #10296. Invoice #10296 was in the amount of $19,071.70; the TD Bank check that contained the invoice reference was in the amount of $18,489.00. Cowles personally delivered the Dong Nan checks to Maine Coast and indicated how they should be applied to Aloha Best invoices. According to Adams, Cowles, using Dong Nan, was causing the issuance of cashier's checks which he delivered to Maine Coast. Adams testified that he had no discussions with Cowles about changing the Aloha Best account to reflect a direct relationship with Dong Nan during the period when the checks were issued. He, nevertheless, was aware that the Aloha Best account was in arrears and was monitoring the situation. Adams testified, however, that the outstanding invoices to Aloha Best were satisfied by the six TD Bank checks.[8]

On June 9, 2014, Cowles, using his Maine Coast email address, emailed Jennifer Ewing and Adams advising them to "split the Aloha account, stating "[t]he DongNanXiBei [sic] side is the paying side (the restaurant in HNL is the customer)." He stated that the invoices for Dong Nan were #10344, #10356, #10382, #10384, #10386, #10396, #10408, #10409, #10410, #10427, #10434, #10441, #10456, #10457, and #10464.

---

[8] The chart on page 15 summarizes the outstanding invoices submitted by the Plaintiff in Exhibits 5 and 7. The chart on page 40 summarizes payments made by Cowles to Maine Coast with cashier's checks that were derived from deposits into his personal bank account ending in ***488 in Dong Nan's name.

Additionally, he stated "Current Payment of $152,000 is to be allocated to Dong Nan Xi Bei invoices: 10344, 10356, 10382, 10384, 10386, 10396" and "Incoming Payment from Dong Nan Xi Bei of $31,864 is to be allocated to Aloha Invoices: 10383 and 10411."

Adams also testified about 11 invoices sent to Aloha Best and 2 invoices sent to Dong Nan for lobster shipments to Shanghai GQT Industrial Co., Ltd. and other entities in China between May 27, 2014 and June 10, 2014, totaling $356,438.30 that remained unpaid.[9] The following chart summarizes the partially paid or unpaid invoices that were admitted into evidence as part of Plaintiff's Exhibits 5 and 7.   As noted above, Maine Coast eventually received funds from Cowles in the total amount of $484,553.00 in the form of cashier's checks bearing a reference to Dong Nan that approximated the partially paid unpaid invoices included in Exhibit 5, i.e., $489,899.60.

[Remainder of Page Intentionally Blank]

---

[9] Counsel to the Plaintiff referenced 13 invoices in Exhibit 7, the compilation of unpaid invoices, with the last two having been sent to Dong Nan.  Exhibit 7 contained only 12 invoices and only one invoice sent directly to Dong Nan in the amount of $29,824.00.   Nevertheless, Exhibit 25 establishes that the missing invoice in Exhibit 7 (#10522) was in the amount of $29,581.00.  Thus, the total of unpaid invoices is $356,438.30.  That sum roughly corresponds to the amount of "outstanding invoices 2013/2014" Cowles listed on Schedule F – Creditors Holding Unsecured Nonpriority Claims as being owed to Maine Coast, namely $348,000.00.

| Date | Invoice Number | Bill-To | Ship-To | Amount |
|---|---|---|---|---|
| 5/14 | 10292 | Aloha Best | Shanghai GQT | $22,573.20[10] |
| 5/15 | 10295 | Aloha Best | Shanghai GQT | $54,044.10 |
| 5/15 | 10296 | Aloha Best | Shenzhen Shun | $19,071.70 |
| 5/18 | 10318 | Aloha Best | Shanghai GQT | $53,307.10 |
| 5/19 | 10320 | Aloha Best | Shanghai GQT | $52,401.80 |
| 5/20 | 10327 | Aloha Best | Shanghai Regal | $51,287.50 |
| 5/21 | 10343 | Aloha Best | Aloha Best | $15,823.50 |
| 5/21 | 10344* | Aloha Best | Aloha Best | $51,762.70 |
| 5/22 | 10356* | Aloha Best | Shanghai GQT | $34,106.60 |
| 5/25 | 10382* | Aloha Best | Shanghai GQT | $34,777.40 |
| 5/25 | 10383** | Aloha Best | Aloha Best | $15,837.80 |
| 5/25 | 10384* | Aloha Best | Shanghai GQT | $17,598.20 |
| 5/26 | 10386* | Aloha Best | Shanghai GQT | $34,817.00 |
| 5/29 | 10411** | Aloha Best | Aloha Best | $16,027.00 |
| 6/5 | 10463** | Aloha Best | Aloha Best | $16,464.00 |
| **TOTAL( Ex. 5)** | | | | **$489,899.60** |
| 5/27 | 10396*[11] | Aloha Best | Shanghai GQT | $34,469.60 |
| 5/28 | 10408* | Aloha Best | Shanghai Haibing | $32,488.30 |
| 5/29 | 10409* | Aloha Best | Shanghai Haibing | $22,645.50 |
| 5/29 | 10410* | Aloha Best | Shanghai Haibing | $23,091.00 |
| 6/1 | 10427* | Aloha Best | Shanghai Haibing | $15,656.00 |
| 6/2 | 10434* | Aloha Best | Shanghai Haibing | $30,984.00 |
| 6/3 | 10441* | Aloha Best | Shanghai Haibing | $30,946.00 |
| 6/4 | 10456* | Aloha Best | Shanghai Haibing | $30,163.00 |
| 6/4 | 10457* | Aloha Best | Hengfeng Import | $16,762.50 |
| 6/5 | 10464* | Aloha Best | Shanghai Haibing | $30,013.40 |
| 6/9 | 10495 | Aloha Best | Shanghai Haibing | $29,814.00 |
| 6/10 | 10504 | Dong Nan | Shanghai Haibing | $29,824.00 |
| 6/11 | 10522 | Dong Nan | | $29,581.00 |
| **TOTAL (Ex. 7)** | | | | **$356,438.30[12]** |

At the beginning of June 2014, Adams was becoming increasingly disenchanted with Cowles's performance.  In an email dated June 8, 2014, he advised Cowles to "collect

---

[10] The invoice amount was $53,332.40.  Of that amount, $30,759.20 was paid leaving a balance of $22,573.20.

[11] Invoice #10396 is included in Plaintiff's Exhibit 5, as well as Plaintiff's Exhibit 7.  Invoice #10396 is listed below in the table as remaining unpaid.  *See* note 7, *supra.*

[12] In an email to Adams and Ewing on June 9, 2013, Cowles directed that there be a split of the Aloha Best account such that the invoices with a single asterisk were to be billed to Dong Nan and those with a double asterisk were to be billed to Aloha Best.

as much money as possible from your delinquent accounts."  In addition, he expressed irritation with Cowles's relentless complaints about money problems and allegations that Maine Coast was withholding his pay, noting that he had advanced Cowles's pay many times to "help your situation."  He did not address Cowles's suggestion that he be paid a straight salary of $90,000.00 per year.

Cowles justified his complaints to Adams, by testifying that Adams cut his commissions in half because he was acting as a broker and he was "passing that cost onto Apollo Corporation [and] the Chinese." Adams admitted that he reduced commissions because the company proposed a new compensation plan for all employees, adding that Cowles did not resign in response to that change in January of 2014.

In response to delays in payment by Aloha Best, Adams told Cowles that Maine Coast needed to get prompt payment and to "get this account current." Adams testified that Cowles informed him that he was working with Aloha Best, whose principal was traveling in China, to rectify the situation, without advising him that Aloha Best was not, in fact, the customer.  Indeed, according to Adams, Cowles told him in person and in emails that he was waiting to obtain funds from Aloha Best.[13]

Adams finally reached out to Jae Chen, the principal of Aloha Best, in mid-June, without telling Cowles.  Adams testified that, when he informed Jae Chen that Aloha Best owed Maine Coast over $400,000, Jae Chen, whose English language skills were limited,

---

[13] As noted above, Cowles admitted he instructed Aloha Best to wire payments for Maine Coast lobsters to his bank account at TD Bank in Rowley, Massachusetts.  Indeed, in his Answer to the Amended Complaint, he admitted that he did so on or about March 9, 2014.

"was very upset" and "expressed disbelief." In addition, Adams stated that Jae Chen provided him with "bank account information and text messages from Jonathan Cowles asking him to send payment directly to a personal account of Jonathan Cowles in Rowley, Massachusetts, versus sending any monies to Maine Coast," a fact which Cowles admitted in his Answer to the Plaintiff's Amended Complaint.[14]

Following conversations with Jae Chen, Adams confronted Cowles about Dong Nan. Cowles told Adams that Jackie Lu was the owner of Dong Nan and was a resident of Hong Kong. He also provided him with "a Hong Kong identification number for Jack Lu, as well as a signed credit application for further shipments." The "Application for Credit" (the "Credit Application") provided to Maine Coast by Cowles on behalf of Dong Nan set forth annual sales of $12 million by Dong Nan, which identified itself through Jackie Lu as a "Sole Partnership,"[15] whose address was 225 Franklin Street, Boston, Massachusetts. The Credit Application, which was dated June 11, 2014, contained a bank reference, namely the Industrial Bank of China, and had an electronic signature for Jackie Lu. It also had a telephone number for Jackie Lu in the United States that contained an extra digit. Moreover, the Credit Application was substantially incomplete as there were

---

[14] Specifically, Cowles admitted that "[o]n or around March 9, 2014, Cowles instructed Aloha Best to wire payments for Maine Coast lobsters to a bank aacount at TD Bank in Rowley, Massachusetts, rather than paying Apollo directly."

[15] It is unclear whether this designation was added by Cowles or was part of the Credit Application. The Court infers a "Sole Proprietorship," rather than a "Sole Partnership,"category was intended as a partnership, by definition, is typically an association of two or more persons to carry on as co-owners a business for profit.

no addresses or contact information for Industrial Bank of China and the three required references.

> According to Adams, Cowles encouraged him to continue to ship to Dong Nan:

> [H]e begged me to please allow these two shipments to go. The customer was relying on them and that -- these shipments were meant for weddings and celebrations, that if we did not ship them the customer, Dong Nan Xi Bei, would lose face in China and that would affect his business greatly and would affect us being repaid for all of the debt.

Adams had reservations about the Credit Application but testified that omissions were not unusual in paperwork received from Asian customers and that he received the Credit Application through a trusted employee.  Accordingly, he grudgingly permitted the shipments, stating "I felt I was being strong-armed to continue to extend credit but I was worried about offending the customer that I was now being told owed me hundreds of thousands of dollars," adding that he conditioned shipments on the receipt of the Credit Application and that the Credit Application was not a "mere formality."  He explained the discrepancy between the date of the credit applications and shipments on behalf of Dong Nan with reference to an email forwarded to him by Cowles on June 11, 2014, which Cowles received on June 10, 2014.  The email was ostensibly from Jackie Lu's email address, jnxb88@gmail.com" and was addressed to atlanticoceanproducers@gmail.com. The email was signed by Ginger Chan as Purchasing Assistant and provided, in part, the following:

> Dear Mr. John,
> Please open attached our account file document for Mr Tom.
> Mr. Lu will arrive Boston 18 June to finish open office.

He ask Mr Tom's able to meet next week to see new tank facility and meet
Company?  He bring company paperwork from Boston.  Mr Lu wants to
chat about New Year Supply of lobster.
Mr Lu say ok he will speed up payments . . . .

As of June 11, 2014, Cowles was representing that Dong Nan was a legitimate customer
of Maine Coast.  As will be discussed in detail below, he admitted, at trial, that Dong Nan
was a name for a business that he was conducting.  In addition, he admitted that there
was no bank account at the Industrial Bank of China and that he created the Gmail
account for Dong Nan.

On June 14, 2014, Cowles sent Adams an email using the email address
atlanticoceanproducers@gmail.com, advising Adams that he had bought out his non-
competition agreement with American Holdco, Inc. through a family loan and that he
would be "active in the Asia market with close long-term relations with China CEOs,"
adding "[I] hope we can discus a wide range of packing possibilities . . . ."   Cowles
attached to his email a copy of a "Release of All Demands," executed by the Credit
Manager of American Holdco, Inc., which reflected receipt of a payment of $9,986.94.

Shortly thereafter, and just several days after Maine Coast's receipt of the Credit
Application from Dong Nan and the two shipments made on its behalf, Cowles resigned
his position at Maine Coast "via some sort of electronic communication," according to
Adams.  Thereafter, Adams attempted to communicate with Jackie Lu as well as Ginger
Chan, whom Cowles represented was more readily available than Jackie Lu who traveled
extensively.

On or around June 12, 2014, at around the same time Cowles resigned, the
following colloquy took place between Adams and Cowles as part of their daily text
message exchanges:

> **Adams**: . . .  I need to know the payment status for Aloha Best/Dong Nam
> [sic] account.  [W]ill they be issuing check today or tomorrow from Boston
> office?
> **Cowles**:  I have notified Mr. Lu of the change and told him that I would not
> be picking up any of his payments directly. He said no problem. He would
> let MC [Maine Coast] office know directly his payment schedule. He should
> be contacted sometime today.  Did you get my earlier email about working
> next couple weeks from home?
> **Adams**:  Ok please at least send/forward/copy me on all company related
> communication to me.
> **Cowles**:  Yes I just read the email.  I can help tie up any loose ends – but i
> [sic] think *a clean break is better starting today*.  There are now only one or two
> active accounts.  I have kept explanation very simple to customers that i
> [sic] am leaving for personal reasons to pursue other career.

(emphasis supplied).  Adams expressed a desire to work amicably with Cowles because
he was unaware that Dong Nan was a fictitious entity.  In that regard, he rejected any
notion that it was appropriate for Cowles to send Maine Coast lobsters to his customers
without notifying Maine Coast.

On June 12, 1014 at 1:05 pm, Adams also wrote to Jackie Lu and Ginger Chan
informing them that Cowles had resigned from Maine Coast and, in addition, advising
them to contact him directly about payments and orders.  He stated that he valued Dong
Nan's business, and looked forward to meeting Mr. Lu, even offering to arrange lodging
for him in York, Maine.

Several hours later, on the same day at 8:23 pm, Ginger Chan wrote to Adams
stating the following:

. . . Mr John explain to contact you about travel trip and business together.

Mr Lu said he will bring payment in person. China is difficult with moving payment place to place. Soon I will now travel plan and to arrange meeting times for Mr Lu accordingly your open schedule.

Adams responded within the hour, stating in part "John had indicated that a significant payment would be sent by Friday, June 13. I am in great need of these monies for cash flow purposes. Please advise if this is possible." Three days later, Ginger Chan responded, indicating that Jackie Lu would bring the payment in person when he traveled to Boston that week. Adams emailed her on June 19, 2014 stating "I am in need of urgent payment. I have been patient but I am not getting responses from you. Please advise as to payment status of $345,320.10 usd [sic] that is due." In response, Ginger Chan wrote: "Sorry we still in Shanghai. Mr. Lu had passport issue and delay trip. Today we make application for wire transfer to send payment funds. May I sent you wire schedule asap." Five days later, on June 24, 2014 at 7:46 pm, Adams emailed Jackie Lu, stating the following: "Please advise as to wire schedule for the $345,320.10 US dollars that is due Maine Coast Shellfish."

On the same day, June 24, 2014, at 11:22 pm, Cowles emailed Adams, signing it with reference to "Flood Tide Seafood Co [sic]," stating in pertinent part the following:

. . . Today I spoke with an intermediary (who is my customer and also Mr. Lu's customer) who is helping Mr. Lu with the issue of payment. The funds are stuck in China due to the way unofficial business Chinese have to move money around to get it out of country [sic]. Mr. Lu is under scrutiny for possibly not paying duty and is laying low.

. . . [H]e is not trying to disappear or not pay. The customers paid Mr [sic] Lu, but Mr [sic] Lu has apparently had to give the funds back until the issue can be resolved to prevent confiscation?

21

The good news is that the payment is just being kept away from Officialdom [sic] until it can be sent.  Because this is happening on Mainland China (not HongKong [sic]) maybe within 1-2 weeks it can be sent?

. . .   When the Non-Compete was cancelled I expanded my reach into Asia. I am expanding agreements and sale to knock out some of the Brokers and now my activity overlaps the customer-base of Mr. Lu (this is how I came to know the latest new today).

<div align="center">***</div>

In the meantime I will diplomatically try to expedite Mr. Lu's payment to you.

On June 25, 2014, after he had terminated his employment with Maine Coast, Cowles emailed Adams in anticipation of a meeting "to review shipping activity and to expedite Maine Coast Accounts Receivables."  Cowles asserted in the email that the terms of his employment had never been finalized, that he rejected Adams's latest offer of a $1,200 per week salary plus a reduced commission of $.02/lb on lobsters sold, and that Adams's attempt to have him sign a non-competition agreement on June 10, 2014 "under the uncertainty of sufficient salary to cover basic household expenses" led to his "immediate resignation."  Cowles added as meeting topics:  "Grandfathered activity (which you approved and did not want details of in October 2013) continued throughout the prolonged period of employment contract negotiation," adding "[i]t is both incorrect and inaccurate to characterize grandfathered activity as 'fraud'" and "not appropriate to malign me in the market for activity that was grandfathered."

Adams testified that his reaction to the email was "[d]isbelief." Adams also testified, as set forth above, that the only "grandfathered activity" authorized by Maine

Coast for Cowles was with respect to Boston Wholesale Lobster and sales of jumbo

lobsters.  Moreover, Adams testified that he was unaware that Cowles was benefitting

from shipments to Apollo and unware that he had a personal financial interest in the

shipments represented by the outstanding invoices (Plaintiff's Exhibit 7) and would not

have permitted the shipments had he known of that interest.

On June 27, 2014, according to Adams, Cowles emailed him notifying him that he

had "assumed control of Dong Nan Xi Bei Co. from the broker Jackie Lu as part of take-

over business negotiations of his Customer-Base [sic] in China." He added:  "As part of

the take-over negotiation, I have agreed to collect Dong Nan's Maine Coast account

balance and route to Maine Coast."  He added:

> The Dong Nan funds are to be sent incrementally to me from China together
> with payments from other customers, and will have to follow China's wire
> transfer guidelines (which means has to go through the same Freight
> Forwarder who acted as import agent).  As you know, Forwarders in China
> act as international paymasters for multiple customers because they have
> the required permits to send funds overseas.  Most secondary end-users do
> not have import licenses and therefore cannot send funds overseas
> themselves.

> Another technical detail . . . is that there has to be current shipping activity
> to the Forwarder in order for a Forwarder to send funds out of China.  I
> currently am utilizing the Forwarder for several customers, therefore I will
> work the increment payments into my own Accounts Receivable from other
> customers.

> Also as part of the negotiation, I have agreed to sort out any mortality issues
> the end-user had in May/June, which were absorbed by Jackie Lu and not
> submitted for Claim to Maine Coast. . . .

> At our meeting next Wednesday, we can discuss re-assigning the old
> account to new ownership, and of course, the schedule of paying down
> Dong Nan's account.

Following the receipt of the June 27, 2014 email from Cowles, Adams began to suspect that Dong Nan might be a fictitious entity created by Cowles, especially because, on July 7, 2014, Cowles emailed Adams indicating that he was "still awaiting funds for the outstanding invoices." In response to Adams's accusations that he was engaged in fraud and embezzlement, Cowles stated "[p]lease note your Statement is inaccurate as notice was given to Jenn several months ago to separate Dong Nan Xi Bei as the 'Bill To.'"

Adams also testified that the magnitude of the outstanding accounts receivable in 2014 had an immense impact on his company and that it was uncertain whether Maine Coast could make payroll, retain its 12-18 employees, and even stay in business. This circumstance arose, according to Adams, even though Maine Coast attempted to limit its credit risks by "investigating our customer base, by obtaining credit applications, by running them through credit reporting services such as Seafax, which is a company based out of Maine that operates much like a Dun & Bradstreet," and by using "credit insurance companies to vet our customers and try to obtain . . . credit receivable insurance that protects us from any major losses." Adams admitted that he had no direct involvement in obtaining credit insurance as that duty was the responsibility of the office manager, bookkeeper or controller.

Adams further testified that he ultimately learned that the recipients of the lobsters billed to Aloha Best and Dong Nan were SK Seafood and its affiliate Shanghai Light. As noted above, Maine Coast had shut off SK Seafood's credit in March of 2014 when it owed Maine Coast over $200,000.00. Adams stated that "[w]e obtained some payments over the course of the next couple months and then payments ceased at some point and we

were able to claim on a credit insurance policy with a balance due after it was deemed
uncollectible." Adams, however, testified that there was no credit insurance for the
$350,000.00 worth of lobsters that were later delivered to Shanghai Light because Cowles
"put them in an account -- directed them under the Aloha Best account . . . [and] . . . the
insurance companies told me anyways that due to the fraud involved they wouldn't have
covered them."[16]

With respect to the SK Seafood/Shanghai Light account, Cowles complained that
Adams gave him a "bad account," adding "I told Tom I would try to eliminate that broker
[Stephen Chen of SK Seafood] from the picture so Maine Coast would have that business
direct - - you know, directly through Apollo who we could control." Cowles admitted
that, acting as a manager of the account, he sold lobsters to Shanghai Light on behalf of
Maine Coast between February 19, 2014 and March 25, 2014. In addition, he testified that
he attempted to collect all the unpaid invoices set forth as Plaintiff's Exhibit 7, which total
$356.438.30, but "no one felt they owed the money." Cowles elaborated by stating that
when he traveled to China, he discovered "the Chinese . . . were not going to pay for those
shipments because they were under the firm knowledge that those were covered by
insurance together with other -- you know, other shipments and so they refused to pay
twice for the same product. . . ."

---

[16] Plaintiff's Exhibit 26 contains a summary of shipments billed directly to Shanghai Light and
shipped to China. The shipments began on August 29, 2013, prior to Cowles's affiliation with
Maine Coast, and ended on March 25, 2014. The invoices, which involved 67,654.60 pounds of
lobster, totaled $599,722.66. The unpaid invoices that were included in Exhibit 7 were all billed
to Aloha Best, with the exception of two invoices billed directly to Dong Nan, and product was
delivered to locations in China.

With respect to Dong Nan, Adams testified that he eventually learned about the identities of Jacki Lu and Ginger Chan from the FBI. He stated that he was horrified to learn that they were "[f]ictitious people made up by Jon Cowles." Adams also indicated that Cowles admitted that he made up the identities at a deposition. With respect to Cowles's creation of a fictitious company and fictitious individuals associated with it, Cowles informed Adams, by way of text message on or around May 11, 2014, that "Aloha has opened their sales in Guangzhou and Shanghai and is ready to place orders there. I anticipate increased payments and orders maybe this week if price is settled a bit. Taiwan May [sic] also be starting to order again . . . ." Eventually, Adams learned:

> . . . Mr. Cowles by deception sent these lobsters to someone that we did not know that was going to be receiving them[,] and within an account that we had a credit account with that had no idea as well[,] that caused us to not be paid the monies and the value of these shipments.

B. Cowles's Testimony

Cowles testified about his financial circumstances prior to involvement with Maine Coast. He indicated that he had been brokering jumbo lobsters for Boston Wholesale while working for East Coast. Because of a salary freeze at East Coast, he approached a Taiwanese contact, Robert Chen, to start a lobster fishing company, Iliana and John LLC, which acquired a lobster fishing boat that operated out of Gloucester, Massachusetts.[17]

---

[17] On his Statement of Financial Affairs, the Debtor reported a loss of $224,995.00 in 2013 attributable to Iliana and John LLC.

26

Cowles testified about his discussions with Adams and admitted that he executed the Letter Agreement sent to him by Adams on behalf of Maine Coast and that he signed an agreement with American Holdco, Inc. and Maine Coast with respect to his non-competition agreement with East Coast.  With respect to the Letter Agreement, Cowles testified:

> This represented the part of my compensation that Tom intended to run through payroll, but that was -- it's not a clear-cut thing of employee or that this -- this document did not define my entire role at Maine Coast. So it's a generic -- was a generic form that formalized that part of my role at Maine Coast.

With respect to the agreement involving American Holdco, Inc., which referenced his status as an employee, he stated

> The term "employee" at that time was a very loose term because I was an independent contractor, so there's some discrepancy as to what role or what definition defined what I did at Maine Coast.

Cowles also testified that his entire compensation from Maine Coast was commission based, part of which was paid to him "through payroll because I needed to have the steady week-to-week income due to my own personal situation." Moreover, Cowles complained that Adams cut his commission income in half in January of 2014, which he described as "a major blow."  He did not resign at that time, however, because he concluded he "could just double . . . [his] . . . sales capacity and make up for the difference," adding that he did not have another option because of the non-compete agreement with American Holdco, Inc.

Despite Cowles's testimony about a "stand off" with Adams as to his employment status, he admitted sending an email to Adams on January 2, 2014, stating:  "I am very

happy working for Maine Coast and like the position we are developing." He indicated that he wanted to discuss certain "HR-Related agenda items, however, including changing his "physical office hours" to "a 9-2 schedule weekdays and 7:30-10 on Saturdays," changing the allocation of childcare expenses, amending the schedule of commission payments, and enrolling early in the company's health insurance plan because he had sole custody of his children and was on a tight budget. On January 27, 2014, Cowles sent Adams another email which provided in pertinent part the following:

> Again as with any HR-Related discussions, I am thankful for the position at MCS and for your very accommodating terms of employment (hours, benefits, etc).
>
> I had mtg [sic] with my HR-Block Tax person to review my finances, projected income and tax strategy for 2014 and may I submit the following for review:
>
> 1. From a tax viewpoint, she recommends (if possible) that I change my status to Indpen [sic] Contractor. I have so many deductions (Business Losses from 2013, childcare, child tax credits, etc [sic]) that based on $100,000 income I will not pay tax for 5 years. . . .
>
> 2. From a cash-flow point of view, the change would help a lot for 2014 until I am stabilized. From an employment point of view I would be bound by all agreements and would for all intents and purposes be a full-time employee.
>
> 3. Regarding HealthInsurance [sic] I have reviewed options and would like to purchase my own insurance in MA, which is advantageous.

Cowles admitted that Adams permitted him to buy health insurance in Massachusetts and was accommodating with respect to his family situation. Moreover, he admitted that Adams did not accede to his request to be an independent contractor, stating:

> He said no to something that already existed and I was trying to gently and politely point out to him that I was already in great part an independent

28

contractor and that this whole issue of employee versus independent contractor was already set when I joined -- you know, when I became part of Maine Coast back in the fall. So I was trying to – because the payroll kept taking out money I tried to just officially change what was already in place. But the fact is, I was only clarifying what already existed, that I had multiple roles and calling it an employee was only like ten percent. The rest of it was something else entirely.

Cowles insisted that he disclosed his relationship with Apollo to Maine Coast, testifying that he brought Lee, the owner of Apollo, as well as Jae Chen, the owner of the Aloha Best restaurant, to New England to meet with Adams the week before Christmas in December 2013.  Indeed, he testified that he flew the principals to Boston, that Lee "fronted the money" for the plane fare, and that both entities filled out credit applications. Nevertheless, although shipments were to be made to Aloha Best and were to be billed to Apollo, Cowles testified that Adams was responsible for listing Aloha Best as both the "bill-to" and "ship-to" entity in Maine Coast's computer system.  Cowles indicated that he brought the error to Adams's attention, adding that he had introduced Jae Kwon Lee and Jae Chen to Adams "to establish that Aloha Best was the exclusive customer of Apollo Corporation and . . . [the] broker . . . [was] . . . Apollo Corporation, Aloha Best was their customer" and that "Tom agreed he would not go around Apollo to try to sell lobsters directly to Aloha Best."  Cowles stated that "the discussions revolved around building a tank in China that Maine Coast would essentially control," explaining that due to his affiliation with Apollo and the exclusivity of Aloha Best with Apollo, "[i]t was a line -- like a chain of exclusivity which ended in China, passed through Apollo and myself, and ended at Maine Coast for Maine Coast benefit."

Cowles further testified that, despite the discussions, "Tom directed me to set it up as the shipment to Aloha Best," asserting that "his exact reason was if he --he told me if shipment doesn't get paid for and he has to take someone to court, he's going to take someone to court who has a physical asset." He added:

> If I had given the manager a sales order for Apollo, she'd be like, well, it's not in the system. So I had to conform what Tom overrode my sales customer in terms of how he set it up in the system. So that's more explanation as to why there's this confusion about Aloha Best and Apollo.

Accordingly, from about mid-December 2013 to mid- March 2014, in Cowles's view, the billing was incorrect because Apollo, not Aloha Best, was the customer. [18] Cowles received a commission on the sales shipped to Aloha Best and expected to earn further money from the 5-7% margin attributable to Apollo owing to its services as broker. He stated that he earned some profit from the margin at the end of March 2014. He testified that he disclosed this arrangement to Adams. In addition he testified that, when invoices were sent to Apollo, Apollo would make its own invoices and forward them to its customers, including Aloha Best. He stated that until his resignation in June of 2014, Apollo "always acted as the intermediary broker between Maine Coast and Aloha Best and other shipments to China," although Maine Coast's records establish that Aloha Best was the "bill-to" beginning on March 27, 2014.

Cowles testified that he advised his co-workers that he needed to send invoices directly to customers because of special paperwork requirements in Asian markets. He

---

[18] Plaintiff's Exhibit 24 would support the view that Apollo was the "bill-to" and Aloha Best was the "ship-to" for that period.

stated that the air waybill from the airline had to match the packing list in order for the customer to claim the shipment. He also testified that Adams approved every shipment that "went out the door."

Cowles admitted that, beginning in mid-December 2013, there were instances where he would take invoices from Maine Coast and create new invoices before product was shipped because he was acting as a broker. Accordingly, with respect to Apollo, he explained that either he or Lee would present "the end invoice to the end customer, the customer of Apollo which was not a customer of Maine Coast." He added: "[s]o in my role as a broker . . . I would receive paperwork from Maine Coast and as a broker I would do what brokers normally do with paperwork such as that." Accordingly, despite Maine Coast invoices identifying Aloha Best as the recipient of both invoices and shipments, Aloha Best would only see Apollo invoices and would have been unaware of the mark-up made by Apollo.

Cowles further testified that "there was never any understanding at Maine Coast that Aloha Best was paying for anything directly or receiving anything directly." He also testified that "within the range of price that [the] market in Honolulu could bear, I always maximized Maine Coast return, but as a broker in my capacity as basically an in-house broker, there was a margin for Apollo . . . which floated a lot."

When asked about his business relationship with Apollo and whether he disclosed the arrangement, he initially stated: "I did in the fall and I did it in a manner that satisfied Tom at the time," adding "[h]e didn't want to know the details of what I was doing in

Asia.  He wanted the results . . ." Cowles admitted, however, that he never expressly

stated that he was acting as a broker with Apollo.  He testified:

> Not expressly. Not spelling it right out. It was in our discussions in August,
> September, October and into November and up until when the principal of
> Apollo came and visited.  The principal Jae Kwon Lee put his arm around
> me and in front of Tom and said, "This is my brother. You know, he's my
> partner. I'm going to take care of him." And it was just kind of a brotherly
> meeting with Tom that the owner identified that I am connected to him very
> closely.

Cowles testified that he was acting as an in-house broker and his goal was to eliminate

"mercenary" brokers whose business model prevented Maine Coast from productively

managing its inventory and shipments.   In addition, he claimed the purpose was the

following:

> Shield[ing] Tom from the implications of basically owning a tank house in
> China. By him controlling that chain of custody through Apollo and Aloha
> Best into China, my -- part of my advising role was to -- and was to shield
> Tom from the VAT, which is value-added tax implication, as well as there
> were some tariff-avoiding behavior practices of the customers in China that
> if an American CEO could be linked to those, the Chinese government
> could detain the American CEO and make a bi[g] media thing of it.

Cowles handled the SK Seafood/Shanghai Light account and agreed that it was a

significant account, generating sales of 61,783 pounds of lobster between December 1,

2013 and March 25, 2014.  In March of 2014, at a time when insurance coverage was

$100,000.00, Shanghai Light fell behind in its payments.  Accordingly, Adams obtained

additional coverage for the account in the sum of $250,000.00, but ultimately cut off

shipments, which was detrimental to Cowles who was obtaining commissions on the

sales.

Cowles commenced private discussions with Stephen Chen and SK Seafood as it dominated the Chinese market for imported lobsters from North America. Cowles explained:

> I had already been working on how to replace Stephen Chen because actually in the fall of 2013 Seafax issued an advisory alert on him for non-payment way back when I was just forming a relationship with Maine Coast, so Tom Adams knew that there were issues long before I even joined. But -- so I am -- I started talking about how to replace these big brokers, this cartel of brokers.

He testified that he identified the customer of Shanghai Light in China and planned to supplant SK Seafood and Shanghai Light using Apollo and creating Dong Nan as a spinoff or extension of Apollo. Thus, Cowles caused Maine Coast to begin shipments to Shanghai in mid-May 2014. Only certain shipments to Aloha Best in Honolulu were for the benefit of Aloha Best; shipments to entities in China were not. Cowles testified that he attempted to correct the billing errors in the computer system:

> I went in several times. Tom actually told me to -- using an expletive to stop telling him to run his business. And I'm like, "But they're not the customer. You're billing to the wrong person," and he did not make those changes. So, you know, I guess I felt like a peon at the time. I'm like, well, if that's how they want to put it in the system, then -- and I keep telling him to change it and they don't, well, I'm not going to beat a dead horse.

Cowles reiterated that Maine Coast invoices generated for Aloha Best for shipments to China were an error on the part of Maine Coast, notwithstanding his protestations to the contrary.

Cowles admitted testifying at a deposition that Dong Nan was "an extension of Apollo" and was, in effect, a sole proprietorship for which he utilized his Social Security number. With respect to orders from Aloha Best, for which Apollo and Cowles obtained

33

a percentage of the value of sales orders, Cowles advised Adams, on June 4, 2014, about

a week before he terminated his relationship with Maine Coast, that Aloha Best had

ordered over 150,000 pounds of lobster valued at $1.2 million; that its payment history

was consistently between 7-21 days, making it "the fastest paying customer in Asia [sic]."

He requested additional time for Aloha Best to catch up on payments, stating: "I cannot

afford to lose a Major [sic] customer."  Cowles, however, was not referring to shipments

to the restaurant operated by Aloha Best.  He explained:

> In this email I'm referencing the Honolulu restaurant, Aloha Best, the
> customer of Apollo or Dong Nan. I think at this time it was -- I had -- you
> know, it had been changed over to Dong Nan Xi Bei. So that, again, because
> of the confusion resulting in not changing the system -- you know, the
> account -- the staff at Maine Coast not changing the system that *China
> shipments at this time were getting behind*. They were not paying on time.

(emphasis added).   In other words, Aloha Best was paying on time for shipments it

received, but the entities in Asia were not.  Moreover, Cowles never disclosed that he

created Dong Nan, relying upon oblique disclosures about Apollo as, in his view, Dong

Nan was an extension of Apollo.  He explained his rationale about actually causing

shipments to Shanghai Light's customer as follows:

> I was avoiding breaking the law by creating this level of deniability and the
> deniability of -- going back a little bit, there was no attempt by me to
> defraud Maine Coast and all these things that are being suggested. There
> were two reasons to establish this -- this level of deniability for Tom. One
> was the issue of VAT tax and the non-traditional transport of the goods
> across the border to avoid tariffs as part of the development of the Aloha
> Best tank house in China and the taking [of] Stephen Chen and Tony Chen's
> business away and giving it to someone who we would basically control
> [sic] creating that level of deniability very much involved. And Tom agreed
> to that project of the deniability and the deniability had to be real. If Chinese
> government [sic] grabbed him in Hong Kong he had to really be able to

34

deny that he knew about the kind of activities that Aloha Best would potentially be doing in China.

Cowles also intimated that Adams was improperly trying to obtain insurance with respect to his shipments to Shanghai Light because he was owed significant monies and his insurance coverage prior to his decision to increase it was only $100,000.00.

C. Cowles's Bank Accounts

During the course of his affiliation with Maine Coase and thereafter, Cowles maintained a number of bank accounts, including the following:  1) a TD Bank account, ending in ***921; 2) a TD Bank account referencing Dong Nan as a "d/b/a," ending in ***488; 3) a TD Bank account referencing Flood Tide Seafood Co., ending in ***801; 4) a Bank of America Core Checking account, ending in ***7001; and 5) a JP Morgan Chase Bank account, ending in ***130.  Cowles also had a savings account ending in ***1766, as his TD Bank accounts reflect electronic transfer credits and debits into and out of that account.[19]  Consistent with the summary of invoices and set forth in the chart on page 15 of this decision, Cowles's bank accounts establish that he was using the Aloha Best account to effect sales to SK Seafood and Shanghai Light.

Beginning in March of 2014, Cowles, in addition to receiving automatic deposits from Maine Coast for salary, admitted that his bank statements from his TD Bank account ending in ***921 reflected wire transfer deposits from "J A SOS INC" that were, in reality, transfers from Aloha Best.  On March 17, 2014, he received a wire transfer in the amount

---

[19] The Debtor listed only one bank account number on Schedule B-Personal Property, i.e., his TD Bank account, ending in ***921.

of $19,275.25 and, on March 20, 2014, he received a wire transfer in the amount of $18,400.00, for a total of $37,675.25. He testified that he received those monies "as broker" and paid Aloha Best invoices with the funds.  His bank statement reflected a debit of $18,512.00 on March 18, 2014 and a debit of $17,721.00 on March 24, 2014, for a total of $36,233.00.   The difference of $1,442.25, Cowles testified, was his Apollo/Dang Nan commission.

Cowles's TD Bank statement for the account ending in ***921 for the period between April 7, 2014 and May 6, 2014 reflected the following:

| J A SOS INC. Wire Transfer | | Cowles's Debits | |
|---|---|---|---|
| Date | Amount | Date | Amount |
| 4/17 | $59,815.00 | 4/18 | $58,200.75 |
| 4/24 | $22,415.00 | 4/25 | $21,918.50 |
| 4/30 | $24,689.20 | 5/1 | $23,788.90 |
| 5/5 | $44,927.00 | 5/5 | $42,405.70 |
| | | | |
| Total | $151,846.20 | | $146,313.85 |

Cowles testified that the difference between the incoming wire transfers and the outgoing debits of $5,532.35 was his broker's commission.  When added to the previous amount, i.e., $1,442.25, his "commissions" totaled $6,974.60.  Thus, beginning in March of 2014 and ending on May 5, 2014, Cowles skimmed $6,974.60 in profits from Maine Coast.   In addition, Cowles's bank statement for this period reflects a wire transfer debit to his brother, Stephen Cowles, in the sum of $5,400.00.  Cowles testified that the transfer did not relate to the boat or vehicle which were titled in his broker's name, discussed below.

Cowles's TD Bank account statement for the account ending in ***921 for the period between May 7, 2014 and June 6, 2014 reflected seven credits arising from wire transfers and four debits, which can be summarized as follows:

| Date | Incoming Wire | Amount | Date | Withdrawal Amount |
|------|---------------|--------|------|-------------------|
| 5/12 | SK Seafood LLC | $50,00.00 | 5/12 | $36,460.75 |
| 5/15 | J A SOS Inc. | $40,000.00 | 5/16 | $50,759.00 |
| 5/16 | SK Seafood LLC | $50,000.00 | 5/19 | $47,508.00 |
| *5/23* | *SK Seafood LLC* | *$79,000.00* | *5/23* | *$77,500.00* |
| 5/27 | J A SOS Inc. | $35,000.00 | | |
| 5/30 | SK Seafood LLC | $140,000.00 | | |
| 6/4 | SK Seafood LLC | $60,000.00 | 6/4 | $60,000.00 |
| **TOTAL** | | $454,000.00 | | $272,227.75 |

In addition, Cowles caused $2,000.00 to be deposited into the account from his TD Bank account for Dong Nan ending in ***488. He testified that the amounts withdrawn from the account were paid to Maine Coast. In addition, Cowles caused the following electronic debits:

| Date | To Account Number | Amount |
|------|-------------------|--------|
| 5/7 | ***1766 | $1,000.00 |
| 5/16 | ***1766 | $1,000.00 |
| 5/23 | ***766 | $1,000.00 |
| 5/27 | ***1766 | $7,543.00 |
| 5/27 | ***488 | $27,457.00 |
| 6/2 | ***488 | $138,000.00 |

Thus, Cowles received a total of $454,000.00 in wire transfers for the period between May 7, 2014 and June 6, 2104, and withdrew substantially less, i.e., $272,227.75, a difference of $181,772.25. The total of the electronic transfers to Dong Nan's account ending in ***488 was $165,457.00. Cowles testified that SK Seafood's "end user," which he had identified through his contacts as Mr. Hua Chen, sent payments to SK Seafood which then directed the payments to him. Cowles insisted that shipments to Hua Chen were resumed in May

of 2014 "with Tom's total consent and knowledge to the end user customer of Shanghai Light through what was originally Apollo but became Dong Nan." Cowles testified that Hua Chen was the ultimate recipient of products for which there were no payments.

Cowles's TD Bank account statement for the account ending in ***921 for the period between June 7, 2014 and July 7, 2014, reflected a deposit of $98,000.00 on July 2, 2014. The account statement also reflected receipt of an electronic deposit from Maine Coast on June 11, 2014 in the sum of $1,581.37 and electronic transfers from the account ending in ***766, totaling $14,000.00, as well as the following incoming wire transfers and electronic transfers:

| Date | Incoming Wire | Electronic transfer credit | Amount |
|------|--------------|---------------------------|--------|
| 6/9 | SK Seafood LLC | | $180,000.00 |
| 6/9 | J A SOS Inc. | | $34,505.00 |
| 6/10 | SK Seafood LLC | | $30,000.00 |
| 6/12 | SK Seafood LLC | | $30,000.00 |
| 6/13 | | From ***1766 | $7,000.00 |
| 6/20 | SK Seafood LLC | | $120,000.00 |
| 6/20 | | From ***1766 | $3,500.00 |
| 6/23 | | From ***1766 | $2,500.00 |
| 6/26 | SK Seafood LLC | | $100,000.00 |
| 6/30 | | From ***1766 | $500.00 |
| 7/2 | | From ***1766 | $500.00 |

Thus, excluding the $98,000 deposit on July 2, 2014, deposits into Cowles's account ending in ***921 between June 7, 2014 and July 6, 2014 totaled $505,505.00. Of that total, $460,000.00 was attributable to wire transfers from SK Seafood. Cowles testified that the deposits from SK Seafood beginning on June 10, 2014 were prepayments for purchase orders that were not going to Maine Coast. Two wire transfers of $30,000.00 each, however, occurred when Cowles was still employed by Maine Coast. Nevertheless,

Cowles indicated that the wire transfers were to satisfy purchase orders from other packers.  In summary, however, wire transfers from Aloha Best ($299,026.45) and from SK Seafood ($839,000.00) totaled $1,138,026.45 between March 17, 2014 and June 26, 2014.[20]

The following electronic transfer debits and other debits from Cowles's TD Bank account ending in ***921 for the period between June 7 and July 7, 2014 are as follows:

| Date | Electronic Transfer to: | Debit Amount |
|------|------------------------|--------------|
| 6/9 | ***488 | $152,000.00 |
| 6/10 | ***488 | $31,864.00 |
| 6/10 | ***1766 | $2,289.00 |
| 6/11 | ***1766 | $30,000.00 |
| 6/11 | ***488 | $29,250.00 |
| 6/12 | ***488 | $29,000.00 |
| 6/13 |  | $9,994.94 |
| 6/20 | ***801 | $100,000.00 |
| 6/23 | ***1766 | $20,000.00 |
| 6/26 | ***801 | $75,000.00 |
| 6/26 | ***1766 | $20,800.00 |
| 6/26 | ***1766 | $3,140.00 |
| 6/27 | ***1766 | $1,000.00 |

The total amount Cowles caused to be transferred to Dong Nan's account for the June 7, 2014 to July 6, 2014 statement period was $242,364.00 which, when added to the transfers from the prior statement period totaled $407,821.00.  Cowles transferred to his Flood Tide account ending in ***801 the sum of $175,000.00 during that same period, as well as $77,229.00 to his TD Bank account ending in ***1766, for a total of $252,229.00.

---

[20] Even if the wire transfers received after Cowles's resignation are subtracted, the total wire transfers equaled $918,026.45 of which he remitted only $484,553.00 to Maine Coast, leaving at least $433,473.45 for which there is no accounting.

Dong Nan's statements for the period between May 19, 2014 and June 30, reflect the following receipts and disbursements.

| Date | Deposit or eTransfer | Amount | Date | Debit | Date | Payments to Maine Coast[21] | Cowles's "commissions" |
|---|---|---|---|---|---|---|---|
| *5/23* | *Deposit* | *$77,500.00* | *5/23* | *$77,200.00* | *5/23* | *$77,200.00* | $1,800.00 |
| 5/27 | eTransfer from ***921 | $27,457.00 | 5/28 | $18,497.00 | 5/28 | $18,489.00 re: Invoice # 10296[22] | $16,511.00 |
| 6/2 | eTransfer from ***921 | $138,300.00 | 6/2 | $140,008.00 | 5/31 | $140,000.00 | |
| 6/4 | Deposit | $60,000.00 | 6/4 | $65,008.00 | 6/4 | $65,000.00 | |
| 6/9 | eTransfer from ***921 | $152,000.00 | 6/9 | $152,000.00 | 6/9 | $152,000.00[23] | $28,000.00 |
| 6/10 | eTransfer from ***921 | $31,864.00 | 6/10 | $31,872.00 | 6/10 | $31,864.00[24] | |
| 6/11 | eTransfer from ***921 | $29,250.00 | 6/11 | $29,142.00 | | | |
| 6/12 | eTransfer from ***921 | $29,000.00 | 6/12 | $29,008.00 | | | |
| 6/13 | eTransfer from ***921 | $29,500.00 | 6/13 | $29,440.00 | | | |
| **TOTAL** | | $574,871.00 | | $572,175.00 | | $484,553.00 | $46,311.00[25] |

[21] These are the amounts of the Dong Nan TD Bank cashier's checks payable to Maine Coast discussed above and set forth in Exhibit 6. The payments total $484,553.00.

[22] That invoice was dated May 15, 2014 and was in the sum of $19,071.00. The invoice was directed to Aloha Best and shipment was made to "Shenzhen Shun Xingsheng/Agricultural Products Co. Ltd." On May 27, 2014, Aloha Best, via JA SOS Inc., wired $35,000.00 to Cowles with respect to an invoice prepared through Dong Nan. Cowles then withdrew $27,457.00 from his account ending in ***921 and deposited the identical sum in his Dong Nan account.

[23] This cashier's check did not have a reference to Aloha Best on it.

[24] This cashier's check related to a June 9, 2014 deposit by Aloha Best in the sum of $34,505.00 and did not contain a reference to Aloha Best on it.

[25] When this sum is added to the other "commissions" set forth above, i.e. $1,442.25 and $5,532.35, the total is $53,285.60.

By way of example, the italicized rows in the charts above beginning on page 37, reflect the deposit of a wire transfer from SK Seafood in the amount of $79,000.00 on May 23, 2014 into Cowles's account ending in ***921, the withdrawal of a similar sum from that account and an eTransfer deposit into Cowles's Dong Nan account ending in ***488, followed by a bank check payable to Maine Coast on the same day in the amount of $77,200.00, a difference of $1,800.00.  Cowles admitted that he never informed Maine Coast about the receipt of $79,000.00 from SK Seafood or the retention of $1,800.00. Cowles also testified, however, that "as a broker," he sometimes used his own profits "to make a clean payment," thereby explaining the disparity between the $60,000.00 deposit and the $65,000.00 payment.  He also explained the use of cashier's checks:

> A broker would not in the course of business reveal really anything about his customers and acting as a broker and collecting, you know -- it was well established by Tom that he expected me to fill my gap acting as a broker. So everything that fell under the responsibilities of a broker, including collecting payment from the broker and customers, transferring those, invoicing them, that all fell under being a broker. So in the course of a broker's business he wouldn't necessarily discuss all the details of his business with his suppliers, especially if the supplier, you know, was very aggressive about taking that information and using it against the broker in terms of like going after an end user customer or, you know, things of that nature.

Despite Cowles's retention of unauthorized broker's commissions in the total sum of $53,285.60 ($1,442.25 + $5,532.35 + $46,311.00), as noted above, he remitted the sum of $484,553.00 to Maine Coast using cashier's checks with references to Dong Nan.

Cowles identified a debit in the sum of $9,994.94 and admitted that it related to his decision to pay American Holdco, Inc. to obtain a release from his non-competition

41

agreement with East Coast.  Although in an email dated June 14, 2014, he advised Adams

that he "was able to take a family loan in and buy out the full release," he evaded a

question about the source of funds for the release by stating:

> Once I left Maine Coast Seafood with no further ties I no longer had an
> obligation to explain myself to him, so we were competitors through and
> through. So buying out my non-compete I didn't feel like I had to be explicit
> about what deal I may have negotiated and where the funds came from to
> pay off the non-compete, which would allow me to pursue brokerage in --
> completely in the open market.

Cowles elaborated:

> The point of borrowing money from family I did not feel the need to give
> the details of my business dealings. And in fact, this money came from
> China as part of a larger negotiation to take over as a broker here in the
> market – in the open market to develop business, so I didn't feel the need
> to explain exactly where the funds came from.

With respect to Dong Nan, as discussed above, Cowles refused to unequivocally

admit that Jackie Lu and Ginger Chan were fictitious individuals, although he admitted

that Dong Nan was merely a d/b/a for his activities.  He referred to Jackie Lu as "a pen

name," adding "Jackie Lu is a name assigned or like a pseudo name for Jackie Sanyo,"

his former sister-in-law who lives in Hong Kong.  He also testified that Ginger Chan was

a Taiwanese "sales girl":  "like a sales girl in an asset, like if I needed someone to fly to

do quality control."  Nevertheless, he admitted that emails in her name came from him.

In addition to obfuscation regarding the identities of Jackie Lu and Ginger Chan,

Cowles justified his perceived dual status at Maine Coast as follows:  "It was this power

struggle almost of him [Adams] trying to get my contact list and then kicking me out of

his company."  Cowles testified that he remained at Maine Coast until mid-June 2014,

that he refused to sign a non-competition agreement, and that he "was acting as a broker the entire time I was at Maine Coast." He stated that "back in October of 2013 I had told him [Adams] straight out that the day he presents me with a non-compete is the day that we're done . . . ." Because Cowles suspected that it was likely that Adams was going to ask him to leave Maine Coast, he testified that he "had started negotiations with the Chinese to look for another job and the funds there [referring to the $180,000.00 wire transfer on June 9, 2014 from SK Seafood into account ending in ***921 and the $152,000.00 Dong Nan payment to Maine Coast] are part of that negotiation and that discussion with China, the difference [i.e., $28,000.00]." He added that, although the wire came from SK Seafood, the money "originated from the people I was negotiating with in China." Thus, Cowles testified that the retention of $28,000.00 (the difference between the June 9, 2014 wire transfer from SK Seafood into account ending in ***921 and the $152,000.00 cashier's check to Maine Coast from Cowles's Dong Nan account ending in ***488), occurred after he stopped working for Maine Coast and was for "purchase orders that had nothing to do with Maine Coast." He stated that they "were to satisfy purchase orders and prepayments to Boston Wholesale . . . orders that got packed by Ipswich Shellfish. " He explained:

> I wasn't just going to disassociate with Maine Coast without having an alternative party in place. Like looking for a job before you quit the -- you know, wherever it is you're working or associated with because I had two kids and I can't just be floating around out there with no source of income.

Thus, Cowles had Ipswich Shellfish Co. and Boston Wholesale Seafood pack lobsters for him when he acted as broker, establishing accounts in July 2014 at Bank of America

(account ending in ***7001) and JP Morgan Chase Bank, N.A. (account ending in ***130).[26]

Cowles testified about purchasing a boat and a vehicle to tow the boat for a business "to service a project for the Chinese."  Both were titled in his brother's name. Cowles explained that the project was short lived and the boat and vehicle were sold at a loss.[27]  He also testified that he paid the purchase price "on behalf of the Chinese" and that the source of the funds for the boat and vehicle was also from the Chinese who sent him the money for the purpose of establishing a "buying station" - - a "floating pontoon boat which was a buying station for lobsters, and the truck to tow it around."[28]

Cowles's TD Bank statement also showed that he transferred $242,114.00 to Dong Nan's TD Bank account ending in ***488, as well as $175,000.00 to his Flood Tide bank account ending in ***801, with the balance transferred to an account ending in ***1766. Cowles's Flood Tide account, in turn, reflected electronic deposits between June 23, 2014 and June 25, 2014 from the account ending in ***1766, totaling $22,300.00.  On June 20, 2014, June 24, 2014, and June 26, 2014, Cowles caused TD Bank to wire transfer

---

[26] Neither account was listed on the Debtor's Schedules or Statement of Financial Affairs.

[27] The Debtor did not disclose these assets, transfers, or any aspect of the transaction on his Statement of Financial Affairs.

[28] With respect to his closed Bank of America bank account, Cowles disclaimed any understanding of the requirement set forth on the Statement of Financial Affairs that as a debtor he was to list all financial accounts that were closed within the year immediately preceding the commencement of the case.

$100,000.00, $20,000.00 and $75,000.00, respectively, from his Flood Tide account ending in ***801 to Boston Wholesale Lobster - -a total of $195,000.00.[29]

With respect to the $98,000.00 deposit on July 2, 2014 into his account ending in ***921, Cowles testified that he received the money from SK Seafood, although it neither received nor paid for the product. He stated the deposit related to "a purchase order that was to be packed at Boston Wholesale." Notably, on July 3, 2014, Cowles issued a check in the amount of $98,000.00 to an unknown payee.

Cowles maintained that he did not steal from Maine Coast and that he did not have possession of funds relating to unpaid invoices. He also testified that he never received any commissions or broker's fees relating to the unpaid invoices, although he clarified:

> I was paid up to date for commissions from Maine Coast when I departed in June and those included -- we calculated in there those invoices that were outstanding, even though they hadn't been paid yet.

He later testified that he did not receive any commissions on unpaid invoices. Finally, he testified that Maine Coast paid him "0.25 cents a pound for all those shipments, even though they weren't paid," adding that he did not have a chance to collect his commission as a broker.

---

[29] Neither this bank account nor the transfers to Boston Wholesale Lobster were disclosed on the Debtor's Statement of Financial Affairs. The Debtor listed Boston Wholesale Lobster as a creditor on amended Schedule F-Creditors Holding Unsecured Nonpriority Claims as the holder of a claim in the amount of $79,000.00 "for advance commissions, lobster buying station expenses, legal fees."

D. <u>Maine Coast Employees' Testimony</u>

Maine Coast's Controller, Michael Delahanty ("Delahanty'), who began working at Maine Coast in May of 2015, testified about his duties overseeing planning and strategic development, as well as day-to-day financial activities.  He stated that he was familiar with the accounts receivable insurance practices at Maine Coast, including those in place in 2014.  He testified that SK Seafood was an insured customer of Maine Coast in 2014 and that Maine Coast submitted a claim for unpaid Shanghai Light invoices around March 20, 2014.  He added that a payment was received in October of 2014 but was unrelated to the unpaid invoices set forth in Plaintiff's Exhibit 7.  Delahanty stated that Cowles owes Maine Coast "just over $345,000 and that Maine Coast was unable to submit a claim for lobsters shipped to Shanghai Light but billed to Aloha Best, which was uninsured.

Delahanty indicated that Maine Coast had credit applications from Apollo and Aloha Best, which were executed in January of 2014 and December of 2013, respectively. He testified that Maine Coast began shipping to Aloha Best as the "bill-to" at the end of March 2014 at about the same time as it stopped shipping to Apollo as the "bill-to."

In response to Delahanty's testimony about credit and insurance, Cowles, when asked specifically about the Dong Nan Credit Application, responded that its credit account "originated from Apollo, so it was already established."  In addition, at a deposition taken in prior litigation between the parties, Cowles admitted that Maine Coast was unaware of post-March 2014 shipments to Shanghai Light, believing instead

that Dong Nan was the party failing to pay on time.  Cowles testified that although he

understood he was shipping to a customer of Shanghai Light,

> It was only much, much later that that became a grey area for me to the
> point where I left China very quickly because of the insurance - related
> aspects of what I was - what I had come to discover in China when I visited
> there and subsequently. I needed to stay very far away from that subject or
> those people. And so I learned things later on that contradict, you know,
> what – you know, there -- and that's when I had a chance to correct what I
> had stated in a deposition because it's -- my discoveries in China because
> there is such an extensive what I call highly irregular insurance practices by
> companies in Maine including Maine Coast and this primary Chinese
> company. And so basically when these shipments went out that was my
> understanding and my reality at the time was, and I was very excited and
> so was Tom and all the staff, that we were shipping to the customer of
> Shanghai Light. And that was, you know, go 100 percent, go gangbusters,
> let's get this account and run with it.

> And it was only later that I discovered that there was a lot of overlap in
> China and that the Hua Chen that I was shipping to that there were a lot of
> ties and I don't know what you call them, a very intricate relationship in
> China that scared the heck out of me because of who else was there at those
> meetings. And I could not -- I could not pursue collections anymore after
> that meeting in September [2014 when he traveled to China].

Adams, testified, however that he contacted Steven Chen and learned that

Shanghai Light "was indeed, the end user of the lobsters."  Adams rejected Cowles's

intimation that he participated in insurance fraud or avoidance of taxation in China,

adding that he would not jeopardize his growing business in that fashion.  He further

testified that Maine Coast has TSA screening facilities in York, Maine and Boston

Massachusetts and that TSA relies upon its integrity to do screening, thereby improving

its margins by eliminating airline fees and custom brokerage fees.

As a result of his discussions with Stephen Chen of SK Seafood, Maine Coast

Stephen Chen, and SK Seafood, LLC executed a Settlement Agreement on April 9, 2015

pursuant to which the parties acknowledged that Maine Coast was "owed a balance of

$354,000.00 for shipment of Maine Coast lobsters made in May and June 2014 that were

ultimately received by SK Seafood and/or Chen. . . ."  Chen and SK Seafood agreed to

pay Maine Coast $220,000.00 within 12 months in exchange for a release with respect to

the $345,000.00 balance.  Adams testified:

> We agreed to that amount after we reviewed Mr. Cowles' [sic] bank
> statements and realized the amount of monies that had been sent to him by
> SK Seafood and that there was approximately $130,000 that he received that
> was never received by Maine Coast.

Although Chen and SK Seafood agreed to pay $220,000.00 to Maine Coast, Adams

testified that Maine Coast received only $2,000.00.  Adams also testified that Maine Coast

paid Cowles the commissions he earned regardless of whether the invoices had been

paid.  He also reiterated that Maine Coast would not have shipped to Apollo or Aloha

Best if it had been aware that Cowles was earning money on sales in addition to the

commissions paid to him by Maine Coast, and it would not have shipped to Dong Nan if

it had known that it was a d/b/a of Cowles.

Maine Coast's office manager, Jennifer Ewing, also testified at trial.  She stated

unequivocally that Cowles did not tell her that invoices to Apollo or Aloha Best should

be issued to Dong Nan until June of 2014.  Indeed, she indicated that she had never heard

of Dong Nan until June of 2014, although she recognized her hand writing on a document

that provided that a March 16, 2014 shipment had an address for Dong Nan on it and

identified Aloha Best as "consignee."  She credibly contradicted Cowles's testimony that

he repeatedly asked that "bill-to" and "ship-to" addresses be corrected.

Cowles's former colleague at Maine Coast, Gallucci, testified that he was engaged in business development for Maine Coast and sold lobsters for the company as an employee, adding that he had always been an employee and not an independent contractor.  He further testified that he was a salaried employee and was entitled to commissions as part of his total compensation, payable quarterly at the rate of 1.4 cents per pound.  He also testified that he did not make any "margins" on the lobsters he sold.

## III. DISCUSSION

### A. Witness Credibility:  The Debtor's Status as an Employee of Maine Coast

Before analyzing the law applicable to the counts set forth in the Plaintiff's Amended Complaint, it is worthwhile to assess the credibility of the witnesses and Cowles's status as an employee or independent contractor of Maine Coast.  The Court finds the overwhelming weight of the evidence compels the conclusion that the Debtor was an employee of Maine Coast for the numerous reasons set forth below.

Adams, on the one hand, was a credible witness whose recitation of Maine Coast's business practices and experience with Cowles reflected both his personal and business integrity.  Cowles, on the other hand, was not a credible witness.  His description of his duties at Maine Coast and testimony about business opportunities he pursued in China for the benefit of Maine Coast were frequently vague, incomprehensible, grandiose, inconsistent, and unbelievable.  His intimation that Maine Coast engaged in insurance fraud was nonsensical and unsubstantiated as this Court credits Adams's testimony that he would not jeopardize his growing business by engaging in a shortsighted scheme to make fraudulent insurance claims for uncollectible receivables.  In addition, the Court

49

discredits Cowles's testimony that he was acting to protect Adams and Maine Coast from the vagaries of conducting business in Asia.  On the contrary, Cowles testified that he was suspicious that Adams intended to steal his Chinese contacts and then fire him.  The Court finds that at all times Cowles was acting to protect his own interests and had no compunction about using Maine Coast to advance his personal financial interests.

Based upon the credibility of the witnesses, including Gallucci who testified about his role as a sales person at Maine Coast, the Court finds that Cowles was offered and accepted a position as an employee of Maine Coast and that only a limited part of his total compensation was to involve brokerage commissions on the sale of jumbo lobsters. The Court further finds that Cowles only was authorized by Maine Coast to act as a broker for Boston Wholesale Lobster for the sale of large lobsters.

The Court's determination that the Debtor was an employee of Maine Coast is supported by the express terms of the Letter Agreement he executed on November 12, 2013, together with his execution of state and federal tax withholding forms, and the tripartite agreement among Maine Coast, Cowles and American Holdco, Inc. pursuant to which American Holdco, Inc. agreed to release Cowles from his non-competition agreement with it "during his employment at Maine Coast exclusively & solely for the activities performed on behalf of Maine Coast" in exchange for the payment of $21,789.56. In this regard, not only did Cowles act in a manner that contradicted the terms of his employment with Maine Coast, he breached his non-competition agreement with American Holdco, Inc. by operating outside the scope of his employment at Maine Coast by acting as an "in-house broker" at Maine Coast.  Notably, Cowles lied to Adams about

the source of his payment of $9,986.94 to "buy out the full release" of his agreement with

American Holdco, Inc.

The Letter Agreement Cowles signed on November 12, 2013 was not ambiguous.

Adams, on behalf of Maine Coast, offered Cowles a position as "Export Sales Manager,"

referenced a base salary and described his eligibility for benefits, including group health

insurance and paid vacation.   The terms of the Letter Agreement are inconsistent with

independent contractor status.   Maine courts frequently reference "the seminal . . . 1931

decision in Murray's Case, 130 Me. 181, 154 A. 352 (1931)."  *See* Scovil v. FedEx Ground

Package Sys., Inc., 886 F. Supp. 2d 45, 51–52 (D. Me. 2012).   According to the court in

Scovil,

> The [Law] Court quoted earlier decisions that an independent contractor
> "is one who carries on an independent business, and in the line of his
> business is employed to do a job of work, and in doing it does not act under
> the direction and control of his employer, but determines for himself in
> what manner the work shall be done." Id. The Court listed the following
> eight "tests of the relationship," saying that they were "not necessarily
> concurrent or each in itself controlling":
>
>> (1) the existence of a contract for the performance by a person
>> of a certain piece or kind of work at a fixed price; (2)
>> independent nature of his business or his distinct calling; (3)
>> his employment of assistants with the right to supervise their
>> activities; (4) his obligation to furnish necessary tools,
>> supplies, and materials; (5) his right to control the progress of
>> the work except as to final results[;]: (6) the time for which the
>> workman is employed; (7) the method of payment, whether
>> by time or by job; (8) whether the work is part of the regular
>> business of the employer.
>
> Id. at 354. But the Court also said that "[t]he test of the relationship is the right to
> control. It is not the fact of actual interference with the control, but the right to
> interfere, that makes the difference between an independent contractor and a

servant or agent." <u>Id.</u> at 354 (quoting <u>Tuttle v. Embury–Martin Lumber Co.</u>, 192 Mich. 385, 158 N.W. 875, 879 (1916)); *see also* <u>id.</u> at 355 (citing <u>Franklin Coal & Coke Co. v. Ind. Comm.</u>, 296 Ill. 329, 129 N.E. 811 (1921)). . . .

<u>Scovil</u>, 886 F. Supp. 2d at 52. *Cf.* <u>Ruggiero v. Am. United Life Ins. Co.</u>, 137 F. Supp. 3d 104, 112 (D. Mass. 2015) (citing Mass. Gen. Laws ch. 149, § 148B(a)).[30]   Consideration of the foregoing factors supports the Court's conclusion that Cowles was an employee of Maine Coast.   Adams set the price per pound at which lobsters could be sold.   The sales personnel operated in an area where their conversations could be overheard and where there was considerable interaction among the employees.   Moreover, the sales personnel

---

[30] In <u>Ruggiero</u>, the court stated:

> The statute presumes that "an individual performing any service" is an employee and therefore is entitled to the benefits of the Massachusetts wage and overtime laws. *See* <u>id.</u> (quoting Mass. Gen. Laws ch. 149, § 148B(a)).
>
> To rebut the presumption and classify an individual as an independent contractor, a putative employer must satisfy a three-prong test set forth in § 148B(a):
>
>> An individual performing any service ... shall be considered to be an employee ... unless:
>>
>> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>>
>> (2) the service is performed outside the usual course of the business of the employer; and
>>
>> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.
>
> Mass. Gen. Laws ch. 149, § 148B(a).

<u>Ruggiero</u>, 137 F. Supp. 3d at 112.   Assuming Massachusetts law were to apply, Cowles would have had the burden of satisfying the three-prong test set forth above.

were expected to keep regular business hours.  Adams acceded to slightly more flexible

hours for Cowles because of his family's needs and because of the time zones between

the East Coast of the United States, Honolulu, and Asian markets.  Nevertheless, Adams

and Cowles were in constant communication exchanging emails and text messages on a

daily basis.  Adams authorized pay advances to Cowles, authorized the office manager

to provide him with copies of invoices to account for the more complex shipping

arrangements for sales to the Chinese market, and, at all times, considered him an

employee, who as Export Sales Manager, reported to him.

Cowles, however, despite executing documents which unambiguously set forth

his status as an employee, never intended to accede to Adams's control.  He maintained

that he was an independent contractor, stating "that this whole issue of employee versus

independent contractor was already set when I joined" Maine Coast, thereby entitling

him to earn commissions as a partner with Jae Lee of Apollo and by acting as a broker for

deals he made with SK Seafood and Shanghai Light after Maine Coast ceased shipping

to Shanghai Light for nonpayment.

Thus, Cowles, through his testimony, revealed that he never intended to be bound

by the terms of his employment agreement with Maine Coast and that his deceitful intent

was formed at the outset of this employment.  Moreover, he went to extraordinary

lengths to conceal his activities with Apollo by creating invoices and manufacturing a

phony entity, Dong Nan, preparing a phony Credit Application for that phony entity,

and sending egregious emails from Jackie Lu and Ginger Chan to Adams to hide his

activities and perpetuate his scheme to skim profits from Maine Coast.  Indeed, Cowles

already had used this modus operandi at East Coast where he had arranged for shipments of lobsters to China and received payment directly, although East Coast had been fully reimbursed for the cost of the lobsters.  Tourkistas, like Adams initially, was unaware of all the details and had not approved the arrangement.

B. Applicable Law:  Section 523(a)(2)(A)

"A discharge under Chapter 7 . . . does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud." § 523(a)(2)(A).  According to the United States Bankruptcy Appellate Panel of the First Circuit in Above-All Transp., Inc. v. Fraher (In re Fraher), No. MB-16-026, 2017 WL 715059 (B.A.P. 1st Cir. 2017),

> The three prongs of this subsection are distinct. Privitera v. Curran (In re Curran), 554 B.R. 272, 284 (B.A.P. 1st Cir. 2016). The necessary elements of either of the first two prongs, false pretense or false representation, require a plaintiff must satisfy six necessary elements. Id. at 285. To establish the third prong, a debt is excepted from discharge for actual fraud, a plaintiff must show that a debtor committed an act that "counts as 'fraud' and is done with wrongful intent . . . ." Husky Intern. Elec., Inc. v. Ritz, 136 S.Ct. at 1586 (ruling fraudulent conveyance scheme can constitute actual fraud notwithstanding lack of false representation). It can be "effected without a false representation." Id. The Supreme Court explained that "[a]lthough 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely." Id. To prevail under any of the three prongs, a plaintiff is subject to a preponderance of the evidence standard. See Grogan v. Garner, 498 U.S. 279, 287 (1991).

In re Fraher, 2017 WL 715059, at *5 (footnotes omitted).

With respect to the false representation prong, the United States Court of Appeals

for the First Circuit in McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001),

determined:

> [A] creditor must show that 1) the debtor made a knowingly false
> representation or one made in reckless disregard of the truth, 2) the debtor
> intended to deceive, 3) the debtor intended to induce the creditor to rely
> upon the false statement, 4) the creditor actually relied upon the
> misrepresentation, 5) the creditor's reliance was justifiable, and 6) the
> reliance upon the false statement caused damage. Palmacci v. Umpierrez,
> 121 F.3d 781, 786 (1st Cir. 1997). Though the first two elements of the
> Palmacci test describe the conduct and scienter required to show fraudulent
> conduct generally, the last four embody the requirement that the claim of
> the creditor arguing nondischargeability in an adversary proceeding must
> arise as a direct result of the debtor's fraud.

In re Spigel, 260 F.3d at 32 (footnote omitted).

Courts recognized that silence may constitute a misrepresentation.  *See* Drake

Capital Securities v. Larkin (In re Larkin), 189 B.R. 234 (Bankr. D. Mass. 1995).  In that

case, this Court observed:

> A debtor's silence and failure to disclose a material fact may constitute a
> misrepresentation actionable under section 523(a)(2)(A). In re Van Horne,
> 823 F.2d 1285, 1288 (8th Cir. 1987) (borrower has duty to divulge all material
> facts touching upon the essence of the transaction). The Court of Appeals
> for the Eleventh Circuit has adopted a more restrictive view, ruling that an
> actual overt false representation is necessary to except a debt from
> discharge for fraud. In re Hunter, 780 F.2d 1577, 1579 (11th Cir. 1986).

> The Court is persuaded that the view of the United States Court of Appeals
> for the Eighth Circuit is correct because the exception to discharge under
> section 523(a)(2)(A) is a codification of the common law tort of deceit.
> Silence may constitute a misrepresentation for the purposes of an action of
> deceit where there is a failure to disclose information that one is bound to
> reveal. *See* Van Horne 823 F.2d at 1288; *see also* In re Jenkins, 61 B.R. 30, 40
> (Bankr.D.N.D.1986); In re Maier, 38 B.R. 231, 233 (Bankr. D. Minn. 1984);
> Matter of Weinstein, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983).

<u>In re Larkin</u>, 189 B.R. at 239.  The exception to discharge for false pretenses is

related to a misrepresentation through silence.  In <u>Old Republic Nat'l Title Ins. Co.</u>

<u>v. Levasseur (In re Levasseur)</u>, 482 B.R. 15 (Bankr. D. Mass. 2012), *aff'd,* 737 F.3d

814, 818 (1st Cir. 2013), the court stated:

> The duty to disclose can be created by the false pretense itself.
>
>> [W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the "false pretenses" provision of Section 523(a)(2)(A).
>
> <u>Moen</u>, 238 B.R. at 791 (citations and internal quotations omitted). If the disclosure is needed to avert the creation of a false pretense, a known misunderstanding, the disclosure becomes obligatory. Still, as is implicit in the requirement of fraudulent intent, the false pretense must be deliberately fostered and not merely the result of inadvertence. <u>In re Grenier</u>, 2009 WL 763352, *10 (Bankr. D. Mass. 2009).

<u>In re Levasseur</u>, 482 B.R. at 29.  In <u>Am. Nat'l Bank v. Lewis (In re Lewis)</u>, No. 15-

02519-ALS7, 2017 WL 2274946 (Bankr. S.D. Iowa May 24, 2017), the court observed:

> The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts intended to deceive.
>
> . . .   Silence or concealment as to a material fact can constitute false pretenses. In short, false pretenses can be made in any of the ways in which ideas can be communicated.

<u>In re Lewis</u>, 2017 WL 2274946, at *2 (quoting <u>Treadwell v. Lodge (In re Treadwell)</u>, 459

.R. 394, 405–06 (Bankr. W.D. Mo. 2011) (citations omitted).  *See also* <u>U.S. v. Hampton (In</u>

<u>re Hampton)</u>, 396 B.R. 28, 30 (Bankr. N.D. Iowa 2008) ("'False pretenses' contemplates 'a

series of events, activities or communications which, when considered collectively, create

a false and misleading set of circumstances, or false and misleading understanding of a

transaction, in which a creditor is wrongfully induced by the debtor to transfer property

or extend credit to the debtor.'").

C. Analysis:  Section 523(a)(2)(A)

Maine Coast contends:

> The Debtor materially misrepresented at least the following: (i) upon the
> date of his employment at MCS [Maine Coast Seafood], the Debtor did not
> disclose that he considered himself a partner in the Apollo business and
> that he earned a portion of Apollo's profits on Apollo's resale of MCS
> lobster to Aloha Best; (ii) the Debtor did not disclose to MCS the true reason
> for his request to transmit invoices himself to MCS customers; (iii) starting
> in May 2014 the Debtor did not disclose, and took active steps to hide, that
> the bank checks he delivered as payment for lobsters MCS shipped on the
> Aloha Best account were from his personal TD bank account and not, as he
> claimed, couriered directly from Aloha Best for delivery by the Debtor; and
> (iv) the Debtor represented the Dong Nan [sic] was an entity separate from
> himself, when in fact is [sic] was "dba" for himself personally.

The Court agrees with Maine Coast's statement and concludes that it sustained its burden

of proof under § 523(a)(2)(A) by a preponderance of the evidence.  *See* Grogan v. Garner,

498 U.S. 279, 291 (1991).

Cowles accepted Maine Coast's offer of employment as a salaried employee

without any intention of fulfilling his duties as an employee.  He testified that "the term

'employee' . . . was a very loose term because I was an independent contractor."  Cowles's

testimony evidences both an intentional misrepresentation that he was accepting

employment as an employee when he executed the November 12, 2013 Letter Agreement

coupled with execution of the tripartite agreement involving American Holdco, Inc., as

well as false pretenses because, although he discussed changing his status to that of independent contractor with Adams, he never expressly or adequately disclosed the scope of his actions in contravention of his employee status.

Cowles's testimony also evidenced an intent to deceive Maine Coast. While concealing his relationship with, and benefits received from, Apollo, he perpetuated Adams's understanding that he was performing his duties as an employee. For example, he sent Adams an email on January 2, 2014 indicating that he was "happy working for Maine Coast." In addition, he sent Adams an email on January 27, 2014 asking to change his "status to Indpen [sic] Contractor," thereby representing in writing and through his conduct that he was an employee at the time, all the while concealing the true nature and extent of his relationship with Apollo's principal and the use of Aloha Best as a conduit for lobster shipments to SL Seafood and Shanghai Light.

Cowles contended that he revealed to Adams his relationship with Jae Lee, at a meeting attended by Lee and the owner of Aloha Best in December of 2013 and that he repeatedly attempted to correct the "bill-to" and "ship-to" entities on invoices sent by Maine Coast, naming Apollo and Aloha Best. Indeed, Cowles testified about discussing, at that December 2013 meeting, a plan whereby Maine Coast would be the beneficiary of the construction of a lobster storage facility in China by Aloha Best. Adams, however, did not recall such a meeting and Jen Ewing could not recall any discussions with Cowles about correcting invoices with respect to Aloha Best and Dong Nan, which, according to Cowles, was an extension of Apollo. Their testimony was both credible and persuasive; Cowles's was not.

58

Cowles admitted that beginning in mid-December 2013 he began creating new invoices before product was shipped because he was acting as a broker, although he also admitted that he never expressly revealed that circumstance to Adams. Cowles's silence with respect to these sales was tantamount to a misrepresentation and also constituted false pretenses. *See* Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013) ("A false pretense or misrepresentation can be created 'when the circumstances imply a particular set of facts, and one party knows the facts to be otherwise,' and where the silent party 'may have a duty to correct what would otherwise be a false impression.'"). Cowles's testimony that he was shielding Maine Coast and Adams from the implications of owning a tank house in China and the resultant VAT tax was incredible. The evidence established that Cowles concocted a scheme whereby he could increase his compensation at Maine Coast's expense, a scheme motivated in part by his pressing financial problems, as well as his history of using his Chinese connections for potential financial gain, i.e., his failed enterprise involving Illana and John LLC and his failed plan for a "floating pontoon boat" which was to be a buying station for lobsters, together with a truck to tow it around. Cowles's belief that he was engaged in a power struggle with Adams whereby Adams was only trying to steal his Chinese contacts and then remove him from the company; his feelings that he was being treated as a "peon," somehow enabled him to justify his conduct and obtain money in the form of direct deposits into his personal bank account from Aloha Best and SK Seafood - - monies that should have been paid directly to Maine Coast. Cowles's defense of his actions was contrived and implausible.

59

Cowles's misrepresentations, in writing and through his silence, as noted above, were coupled with an intent to deceive and to induce Maine Coast to rely upon his misrepresentations and false pretenses in order to obtain money for himself at Maine Coast's expense as he frequently complained to Adams about the financial burdens and difficulties of maintaining a household as a single parent.[31]  Cowles's intent to deceive and to induce reliance is evidenced by his use of Aloha Best, a customer of Maine Coast both before and after the term of Cowles's employment, as the entity to whom invoices should be sent for shipments to China, together with his creation of Dong Nan, his preparation of a Credit Application for Dong Nan, the opening of bank accounts for Dong Nan and other entities, all for the purpose of siphoning monies from Maine Coast through sales to SK Seafood and Shanghai Light after Adams refused to sell more lobsters to Shanghai Light in March of 2014 owing to its nonpayment of invoices, a circumstance that harmed Cowles financially.

Cowles could not explain his receipt of wire transfers from an agent of Aloha Best (J A SOS Inc.) and SK Seafood without reference to his status as an independent contractor or broker, roles that were never authorized by Maine Coast and, according to Adams, would not have been countenanced by Maine Coast had it been aware of Cowles's activities.  For some of the wire transfers received from Aloha Best and SK Seafood, Cowles remitted sums to Maine Coast less some form of unauthorized commission.  At the end of May 2014, however, Cowles no longer remitted sums, although he pressed

---

[31] It is unclear whether Cowles had any liability for the losses incurred by Illiana and John, LLC which he estimated on his Statement of Financial Affairs to be approximately $250,000.00 in 2013.

Adams to continue to ship to Dong Nan and engaged in a series of execrable emails from Ginger Chan to Maine Coast to prevent it from promptly ascertaining the truth about the shipments he engineered.

Adams testified that he relied upon Cowles as a trusted employee until such time as delays in payment by Aloha Best caused him to reach out to Jae Chen in mid-June of 2014. When confronted, Cowles persisted in using Dong Nan to cover his activities, providing Adams with a Credit Application and emails in which he promised that Dong Nan would pay its outstanding invoices, representing among other things that "Mr Lu said he will bring payment in person." Indeed, after he terminated his relationship with Maine Coast, he perpetuated the myth of Dong Nan to conceal his fraud, representing that "the funds are stuck in China due to the way unofficial business Chinese have to move money around to get it out of country," and later that the "Dong Nan funds are to be sent incrementally to me from China together with payments from other customers . . . ."

Thus, Cowles induced Maine Coast to rely upon his overt and implied misrepresentations; it did so, and was damaged. In this regard, Maine Coast's reliance was justifiable. Cowles had an impressive background and valuable language skills, as well as a Masters of Business Administration. His former employer, while noting a problem with one invoice, expressed a willingness to rehire Cowles, believing him to have the potential to be a very successful sales person. Based upon the evidence presented, Maine Coast unequivocally established the required elements under § 523(a)(2)(A). *See* In re Spigel, 260 F.3d at 32. In addition, Maine Coast presented evidence

sufficient for this Court to conclude that Cowles obtained money by false pretenses. *See* In re Levasseur, 482 B.R. at 29.

Finally, Maine Coast quantified the damages it suffered, introducing Plaintiff's Exhibit 7, the unpaid invoices relative to shipments made by Maine Coast to locations in China and billed to Aloha Best and Dong Nan, totaling $356,438.30. In this regard, the Court is unable to reproduce the Plaintiff's alleged total of unpaid invoices, i.e., $343,027.10 which reflects a credit of $2,000.00 for the payment made by SK Seafood in settlement of Maine Coast's claims against it. The Court finds that Cowles remitted payments received from Aloha Best and SK Seafood in the amount of $484,553.00 (Plaintiff's Exhibit 6). Deducting that sum from the unpaid invoices set forth in Plaintiff's Exhibit 5, i.e., $489,899.60, results in an underpayment of those invoices by $5,346.60 ($489,899.60 - $484,553.00 = $5,346.60). Adding that sum to $356,438.30, the total of the unpaid invoices included in Plaintiff's Exhibit 7, results in unpaid invoices stemming from Cowles's unauthorized Maine Coast shipments to SK Seafood and Shanghai Light of $361,784.90 ($356,483.30 + $5,346.60) from which the $2,000.00 settlement payment made by SK Seafood also must be subtracted, leaving a debt of $359,784.90.

The Court also concludes that Maine Coast established that it was damaged as a result of the Debtor's "actual fraud." In Husky Int'l Elecs., Inc. v. Ritz, __ U.S. __, 136 S. Ct. 1581 (2016), the United States Supreme Court determined that a scheme involving fraudulent transfers that occurs without false representations can support an exception to discharge under § 523(a)(2)(A). The Court stated:

In such cases, the fraudulent conduct is not in dishonestly inducing a
creditor to extend a debt. It is in the acts of concealment and hindrance. In
the fraudulent-conveyance context, therefore, the opportunities for a false
representation from the debtor to the creditor are limited. The debtor may
have the opportunity to put forward a false representation if the creditor
inquires into the whereabouts of the debtor's assets, but that could hardly
be considered a defining feature of this kind of fraud.

Husky Int'l Elecs., Inc., 136 S. Ct. at 1587.  Nevertheless, the Supreme Court observed:

"There is no need to adopt a definition for all times and all circumstances here," id.,

stating

"Actual fraud" has two parts: actual and fraud. The word "actual" has a
simple meaning in the context of common-law fraud: It denotes any fraud
that "involv[es] moral turpitude or intentional wrong." Neal v. Clark, 95
U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to
"implied" fraud or fraud "in law," which describe acts of deception that
"may exist without the imputation of bad faith or immorality." Ibid. Thus,
anything that counts as "fraud" and is done with wrongful intent is "actual
fraud."

Husky Int'l Elecs., Inc., 136 S. Ct. at 1586.

The Court concludes that the Debtor obtained money that rightfully belonged to

Maine Coast through deception and trickery.  He implemented a scheme whereby he

caused Maine Coast to ship lobsters to a customer, SK Seafood/Shanghai Light, with

whom it ceased to do business owing to nonpayment to protect his personal income

stream.  He concealed the shipments using invoices in the names of Aloha Best and Dong

Nan while receiving and depositing wire transfers from Aloha Best and SK Seafood into

his personal bank account ending in ***921.   Although he remitted some funds

($484,533.00) to Maine Coast, he obtained sizeable funds from both entities that he did

not remit to Maine Coast, resulting in damages to Maine Coast in the amount of unpaid invoices from "Aloha Best" and Dong Nan for lobsters that were shipped to China.

The Court unequivocally rejects Cowles's testimony that his activities were motivated by a desire to replace Stephen Chen at SK Seafood as broker by selling directly to its customer, Hua Chen. His testimony that he wanted to eliminate "mercenary brokers" for the benefit of Maine Coast by acting as an in-house broker simply had no basis in fact as Maine Coast would not have permitted him to operate as such had it been aware of his activities. Moreover, in view of the magnitude of Maine Coast's losses resulting from sales to SK Seafood, coupled with the magnitude of the wire transfers, even considering payments made by Cowles using Dong Nan cashier's checks, Cowles's testimony is implausible. Like Dong Nan's Jackie Lu and Ginger Chan, the Court concludes that Hua Chen is a fictitious character. Cowles's testimony was simply incredible and his conduct evidenced moral turpitude and intentional wrong. 136 S.Ct. at 1586.

D. Applicable Law: Larceny

Section 523(a)(4) excepts from discharge debts for "larceny." In Nasif v. Palladino (In re Palladino), 560 B.R. 608 (Bankr. D. Mass. 2016), this Court observed:

> "A debtor need not be a fiduciary for a debt to be held nondischargeable for larceny or embezzlement." Reilly v. Miano (In re Miano), 265 B.R. 352, 356 (Bankr. D. Conn. 2001) (citing Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808, 818 (Bankr. E.D.N.Y. 1996)). Moreover, larceny for purposes of § 523(a)(4), is defined by reference to federal common law, which requires establishment of the debtor's actual fraudulent intent in obtaining the property at issue. Id. (citing Caulfield, 192 B.R. at 818). See also Orumwense–Lawrence v. Osula (In re Osula), 519 B.R. 361, 378 (Bankr. D. Mass. 2014). The court in Treadwell v. Glenstone Lodge, Inc. (In re

Treadwell), 459 B.R. 394 (Bankr. W.D. Mo. 2011), compared larceny for §
523(a)(4) purposes and the state law crime, stating the following:

> Larceny is the fraudulent and wrongful taking and carrying
> away of the property of another with intent to convert the
> property to the taker's use without the consent of the owner.
> As distinguished from embezzlement, the original taking of
> the property must be unlawful. For purposes of section
> 523(a)(4), a bankruptcy court is not bound by the state law
> definition of larceny but, rather, may follow federal common
> law, which defines larceny as a "felonious taking of another's
> personal property with intent to convert it or deprive the
> owner of same.'"
>
> In short, section 523(a)(4) excepts from discharge debts
> resulting from the fraudulent appropriation of another's
> property, whether the appropriation was unlawful at the
> outset, and therefore a larceny, or whether the appropriation
> took place unlawfully after the property was entrusted to the
> debtor's care, and therefore was an embezzlement.

459 B.R. at 406 (footnote omitted). As this Court recognized in In re Osula,
519 B.R. at 378, "[l]arceny is the (1) wrongful taking of (2) property (3) of
another (4) without the owner's consent (5) with intent to convert the
property." See also Adamo v. Scheller (In re Scheller), 265 B.R. 39, 53 (Bankr.
S.D.N.Y. 2001), and Great Am. Ins. Co. v. Graziano (In re Graziano), 35 B.R.
589, 594 (Bankr. E.D.N.Y. 1983). In order to establish an exception to
discharge under § 523(a)(4), a creditor bears the burden of proving each and
every element by a preponderance of the evidence. Rutanen v. Baylis (In re
Baylis), 313 F.3d 9, 17 (1st Cir. 2002) (citing Grogan v. Garner, 498 U.S. 279,
291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

The Court concludes that the definition of larceny for purposes of state and federal
common law is the same. . . .

In re Palladino, 560 B.R. at 628.  See also Bd. of Trustees v. Quinones (In re Quinones), 537

B.R. 942, 950 (Bankr. N.D. Cal. 2015) ("'Larceny is distinguished from embezzlement in

that the original taking of the property was unlawful.'"); Mass. Gen. Laws Ann. ch. 266,

§ 30 ("Whoever steals, or with intent to defraud obtains by a false pretense [sic], or

whoever unlawfully, and with intent to steal or embezzle, converts, or secretes with intent to convert, the property of another as defined in this section, whether such property is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny. . . .")

E. Analysis:  Section 523(a)(4)

The Court rejects the Plaintiff's arguments that Cowles was a fiduciary or that he embezzled funds, but need not address them in view of the Court's conclusion that the Plaintiff satisfied its burden with respect to larceny.  The Plaintiff established that Cowles fraudulently appropriated monies due Maine Coast by directing wire transfer payments for lobster shipments to his personal bank account ending in ***921 and skimming profits totaling at least $53,285.60.  *See* In re Palladino, 506 B.R. at 628.  As discussed above, Cowles was not entitled to act as either an independent contractor or broker, and his sales to SK Seafood and Shanghai Light were unauthorized after March of 2014.  Accordingly, his retention of commissions relating to wire transfers and corresponding cashier's checks from Dong Nan was larceny. The evidence was overwhelming that Cowles's taking of the commissions which rightfully belonged to Maine Coast as part of its profit margin was wrongful, occurred without the knowledge or consent of Maine Coast and its principal Adams, and was done with the intent to convert the property.  Thus, Maine Coast is entitled to judgment on Count III in the sum of **$53,285.60.**

F. Applicable Law:  Section 532(a)(2)(B)

To prevail under § 523(a)(2)(B), a creditor must show that:

(1) the debtor made a statement in writing; (2) the statement concerned the debtor's or an insider's financial condition; (3) the statement was materially false; (4) the creditor actually and reasonably relied on the false statement; and (5) the debtor made the false statement with the intent to deceive the creditor.

Privitera v. Curran (In re Curran), 554 B.R. 272, 280 (B.A.P. 1st Cir. 2016), aff'd, 855 F.3d

19 (1st Cir. 2017) (quoting Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 608 (B.A.P.

1st Cir. 2010)). "Failure to establish any one of these elements is fatal to a creditor's claim

to relief." In re Curran, 554 B.R. at 280 (citing Palmacci v. Umpierrez, 121 F.3d 781, 787–

88 (1st Cir.1997)).

In Curran, the bankruptcy appellate panel observed:

The Bankruptcy Code does not define the phrase "statement respecting the debtor's financial condition," and courts disagree "whether to interpret the phrase broadly to include any statement that has a bearing on the financial position of the debtor or an insider, or narrowly so as to include only statements providing information as to a debtor's net worth, overall financial health, or an equation of assets and liabilities." In re Kosinski, 424 B.R. at 608–609 (collecting cases within the First Circuit); see also Cadwell v. Joelson (In re Joelson), 427 F.3d 700, 713–14 (10th Cir.2005) (engaging in detailed analysis of different approaches). Although neither the First Circuit nor the Panel has expressly stated whether the phrase should be interpreted broadly or narrowly (or something in between), the emerging trend within the District of Massachusetts favors a narrow interpretation of the phrase.

When discussing the different approaches, the Kosinski panel stated as follows:

Although a statement of financial condition does not need to be a formal financing statement, it must, in some way, describe the financial condition of the debtor. See [Middlesex Sav. Bank. v. Flaherty (In re Flaherty) ], 335 B.R. [481,] 489 [ (Bankr. D. Mass.2005)] (noting that financial statement need not "be a formal document produced by commercial or banking institutions," but "[n]evertheless, it must describe the financial condition of the debtor"). The normal commercial meaning and usage of "statement" in connection with "financial condition" denote either a representation of

an entity's overall net worth or an entity's overall ability to generate income. *See* [Bal–Ross Grocers, Inc. v. Sansoucy (In re Sansoucy)], 136 B.R. [20,] 23 [(Bankr. D. N.H. 1992) ]; Jokay Co. v. Mercado (In re Mercado), 144 B.R. 879, 883 (Bankr.C.D.Cal.1992); *see also* In re Joelson, 427 F.3d at 714 ("False statements [for purposes of § 523(a) ] are those that purport to present a picture of the debtors overall financial health," including "those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. . . . What is important is not the formality of the statement, but the information contained within it-information as to the debtor's or insider's overall net worth or overall income flow.").

424 B.R. at 609–10. Thus, whichever approach is applied, the statement must, at the very least, contain some description of the debtor's financial condition.

Curran, 554 B.R. at 281–82 (footnotes omitted).

E. Analysis:  Section 523(a)(2)(B)

Maine Coast argues that the "[t]he Dong Nan credit application was in respect to the Debtor's financial conditions because Dong Nan was a d/b/a of the Debtor, using the Debtor's own social security number to conduct business."  The Credit Application Cowles prepared for Dong Nan, however, though false, does not constitute a statement of his financial condition that satisfies the Curran test set forth above.  The Credit Application did not contain a list of assets or liabilities; it did not contain any references to the net worth of the company and, by extension, the Debtor.  It also did not contain any information as to expenses.  It merely referenced $12 million in sales and contained the name of a bank and three references, without any corresponding addresses or contact information.

68

Because the Credit Application did not constitute a statement of financial condition, the Court need not address the other elements required to except a debt from discharge under § 523(a)(2)(B). The Court notes, however, that even if it were to conclude the Credit Application constituted a statement of financial condition, the element of reasonable reliance is absent as the Credit Application was substantially incomplete and contained manifest errors, including Jackie Lu's telephone number which contained an extra digit. Accordingly, the Plaintiff's count under §523(a)(2)(B) fails. In any event, the extension of credit to Dong Nan, i.e., $59,405.00, is subsumed in the damages awarded under § 523(a)(2)(A).

## IV. CONCLUSION

Upon consideration of the foregoing, the Court shall enter judgment in favor of the Plaintiff and against the Defendant in the sum of $359,784.90 on Count I and in favor of the Plaintiff and against the Defendant in the sum of $53,285.60 on Count III. The Court shall enter a judgment in favor of the Defendant and against the Plaintiff on Count II.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  December 15, 2017